FILED
United States Court of Appeals
Tenth Circuit

July 10, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADAM FROST,

Defendant-Appellant.

No. 11-1122

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE COLORADO
(D.C. NO. 1:10-CR-00056-JAP)**

---

O. Dean Sanderford, Research and Writing Specialist (Raymond P. Moore, Federal Public Defender, and Jill M. Wichlens, Assistant Federal Public Defender and Chief, Appellate Division, with him on the briefs) Office of the Federal Public Defender, Denver, Colorado, for Appellant.

Joshua S. Johnson, Office of the United States Attorney General, United States Department of Justice, Washington, District of Columbia (John F. Walsh, United States Attorney, District of Colorado, and Todd Parker Norvell, Assistant United States Attorney, District of Colorado, Denver, Colorado, and Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, and Daniel S. Goodman, Criminal Division, Appellate Section, United States Department of Justice, Washington, District of Columbia, with him on the brief) for Appellee.

---

Before **MURPHY**, **HARTZ**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Adam Frost was tried and convicted for the rape of a 17-year-old girl, and was sentenced to 200 months' imprisonment. In this appeal, Frost challenges his conviction on the grounds that the trial court plainly erred in admitting the hearsay testimony of several witnesses, including the victim's sister, a nurse, and law enforcement officers. Frost also challenges his sentence, arguing that the district court violated his due process rights by not allowing him to make a statement at sentencing until after the court had already decided his sentence.

We find the district court did not plainly err in admitting the challenged testimony. Although some of the challenged testimony was admitted in error, none was so obvious or prejudicial as to warrant reversal under the plain-error standard. We also find the district court's alleged error at sentencing did not seriously impair the fairness of the proceedings.

Accordingly, we AFFIRM the judgment of the district court.

## I. Evidentiary Challenges

### A. Background

#### 1. Undisputed Facts

In November 2009, defendant Adam Frost, a 28-year-old, and the 17-year old victim, A.W., both lived near Ignacio, Colorado. A.W. lived with her mother and stepfather. Frost lived with his mother, Bernice Harris. A.W. was friends with 12-year-old K.A., a girl related to Frost.

On the evening of November 27, 2009, A.W. and K.A. met at a casino on the Southern Ute Indian Reservation. Their plan was to meet up with Frost so that he could purchase alcohol for them. They met up with Frost at his residence, walked to the Thriftway, a nearby convenience store, to buy alcohol, and returned to Frost's room, where they drank and watched television. At some point, K.A. left the room and Frost had sex with A.W. Soon thereafter, A.W. left the house, used her cellphone to call her sister, and told her she had been raped. Her sister met her back at the Thriftway and took her home.

When A.W. got home, she repeated her account of the rape to her parents, who called the police. When the police arrived, she again repeated her story. Then she went to the hospital, received a rape-kit examination, and repeated her story a fourth time to the examining nurse. Finally, she was interviewed by an FBI agent.

### 2. Frost's Theory of the Case

Frost did not testify at trial. But Frost's counsel admitted in her opening statement that Frost had a sexual encounter with A.W., and claimed it was consensual. Counsel stated that soon after the sexual encounter, Harris discovered A.W. in Frost's room, became angry, and kicked her out. Counsel intimated that A.W. fabricated the rape allegation as a way to explain to her parents why she was out on the street at 3:00 AM near Frost's house.

### 3. A.W.'s Testimony

#### a. Direct Examination

On direct examination, A.W. testified she had known K.A. "[a]bout a couple of days" prior to her encounter with Frost. R., Vol. 3, at 120. A.W. met K.A. on the evening of November 27 with the intention of drinking alcohol. The two girls met Frost at his residence and went to the Thriftway, where Frost purchased alcohol. They returned to Frost's residence; Frost entered through the front door and, because Harris was home, he let A.W. and K.A. in through his bedroom window. A.W. and K.A. sat on Frost's bed and drank while Frost played video games. Later, Frost put on a pornographic DVD at K.A.'s request.

At some point, K.A. left the room to go to the bathroom. While she was gone, Frost placed his hand in A.W.'s hand. When K.A. returned, A.W. told her she needed to use the bathroom herself. K.A. had to help her to the bathroom because she was too drunk to get up by herself. In the bathroom, A.W. told K.A. she should not have left her alone with Frost and that she wanted to leave. The two returned to Frost's room. K.A. and Frost whispered to each other, sometimes looking at A.W.

Later, Harris, Frost's mother, entered the room. She saw K.A. and ordered her to leave the room. Frost and K.A. had hidden A.W. under a blanket on Frost's bed and told her to be quiet; apparently Harris did not see her.

After Harris left, Frost climbed into the bed with A.W. He touched her breasts under her shirt, removed her pants and underwear, and touched her vagina. A.W. told him to stop and unsuccessfully tried to push him away. Frost removed his shorts and penetrated A.W.'s vagina with his penis for two or three minutes. Frost then penetrated A.W.'s anus for about four minutes, which caused A.W. to cry out.

At that point, Frost stopped, A.W. put her pants back on, and Harris re-entered Frost's room and told A.W. to get out of the house. A.W. put on her shoes and jacket, and Harris showed her out the front door.

As soon as she left the house, at approximately 3:00 AM, A.W. used her cellphone to call her sister, Bridget W., and told her Frost had raped her. Bridget then met A.W. back at the Thriftway. Bridget brought A.W. home, where she told her mother and stepfather she had been raped. Her parents called the police.

Officers Monica Medina and Jacob Steinhage arrived and questioned A.W. about the incident. A.W. was then driven to a nearby hospital, where she was interviewed and examined by Lynne Murison, a nurse practitioner and certified rape examiner. Finally, A.W. was interviewed at the hospital by John Wallace, an FBI agent.

### b. Cross Examination

Defense counsel's cross examination of A.W. covered much of the same ground as the government's direct examination. Three portions of the cross examination are particularly relevant here. First, counsel questioned A.W. regarding how long she had known K.A. On direct, A.W. had said she had only known K.A. for a couple of days; on cross, however, she changed her answer to "[a]bout a couple of weeks." R., Vol. 3, at 159.

Second, counsel questioned A.W. about her statements to Agent Wallace regarding how she and K.A. had entered Frost's residence:

> Q. Did you tell Agent Wallace that after the three of you left Thriftway and went back to Adam's house that all three of you snuck through the bedroom window?
>
> A. No.
>
> Q. And if he said that, that would be incorrect?
>
> A. Yes.

*Id.* at 212.

Third, counsel pressed A.W. for more details regarding the point in her story when Harris entered Frost's room and ordered K.A. to leave. A.W. reiterated that she had laid down on the bed and that Frost and K.A. covered her with a blanket and told her to be quiet. A.W. explained that although she was uncomfortable, she did not make any noise to notify Harris of her presence. Counsel again asked A.W. about her statements to Wallace:

Q. Did you also say to Agent Wallace that Ms. Harris looked at you and told you you would be okay in the bedroom?

A. No.

Q. And if he says that you said that, that would be incorrect?

A. Yes.

*Id.*

### 4. Alleged Hearsay Testimony

After A.W. testified, the government put on several witnesses with whom A.W. had spoken in the hours following her encounter with Frost: Bridget W., Medina, Steinhage, Murison, and Wallace. These witnesses repeated what A.W. told them about the rape.

Frost did not object to these statements as hearsay.

#### a. Bridget W.'s Testimony

A.W.'s older sister Bridget W. testified about the phone call she received from A.W. at approximately 3:00 AM on November 28, shortly after A.W. left Frost's residence. According to Bridget, A.W. "was crying, and she sounded really scared." R., Vol. 3, at 233. A.W. told Bridget she had been raped by K.A.'s relative. *Id.* at 234. Bridget asked her if she was referring to "Eli," a different relative of K.A.'s, and A.W. corrected her: "No, it was Adam." *Id.* at 244. Bridget told A.W. to meet her at the Thriftway, down the hill from Frost's residence. *Id.* at 234.

Bridget got a friend to drive her to the Thriftway, where she met A.W. *Id.* at 235. A.W. had "[t]ears coming down her face," and was "shaking." *Id.* From there, Bridget and A.W. traveled to A.W.'s home, where she lived with their mother and stepfather. *Id.* at 236. Bridget woke her mother and stepfather and told them A.W. had been raped. *Id.* Their mother called the police, and two police officers soon arrived. *Id.* at 237. A.W.'s father also arrived. *Id.* at 238. Bridget sat on a recliner in the living room, holding A.W. and "just crying together." *Id.*

The police officers "start[ed] asking [A.W.] what happened." *Id.* A.W. identified Adam Frost as her assailant. *Id.* at 239. A.W. "tells them a little bit, but she doesn't really tell everything until we get to the hospital." *Id.*

Bridget traveled with A.W. to the hospital. *Id.* A.W. did not seem fearful or apprehensive during the ride over. *Id.* at 240. At the hospital, A.W. asked Bridget to accompany her during her medical examination; "she seemed really scared and nervous." *Id.* at 241. During the exam, "she was shaking" and looked uncomfortable. *Id.*

### b. *Officer Medina's and Officer Steinhage's Testimony*

Monica Medina and Jacob Steinhage were the Southern Ute Police Department officers who responded to the call made by A.W.'s mother, "a little after 3:00 AM on November 28th." *Id.* at 255–56. When they arrived at A.W.'s home, Officer Steinhage introduced himself to A.W. and started asking questions.

*Id.* According to Medina, A.W. "was very emotional, had a hard time talking," *id.*, and was "distraught" and "crying," *id.* at 257.

Medina testified that A.W. described some of what had happened to her. A.W. explained that she was friends with K.A. and had been planning to sleep over at Harris's home that night. *Id.* She said Adam Frost, "a cousin or uncle" of K.A., was there; that he had provided A.W. and K.A. with alcohol; and that she had consumed some alcohol. *Id.* at 257–58. A.W. told Medina that at some point K.A. left the room, after which

> Adam had taken off his shorts, had pushed her down on the bed and pulled her pants off, and she attempted to kick or push him away but was unable to. She further stated that he had forced himself on her, and that he had penetrated her vagina with his penis.

*Id.* at 258. As she described these events, A.W. "became very, very emotional and cried even more." *Id.* at 258–59. A.W. also told Medina that she told Frost to stop, but "he was not listening." *Id.* at 259. Medina asked A.W. whether Frost had ejaculated, and A.W. said she did not think he had. *Id.*

Medina then asked A.W. how she left Frost's residence. A.W. responded "that [K.A.'s] grandma had came in and kicked her out, had told her to leave, which she was fine with leaving." *Id.* at 260. A.W. said she walked down to the Thriftway and called her sister on her cellphone. *Id.*

After A.W. described what had happened, Medina "asked her if she would be willing to get an examination done at the hospital . . . and she said she was

willing to do that." *Id.* at 261. A.W. elected to go to the hospital with her family, where she arrived at about 4:30 AM. *Id.* at 263.

Officer Jacob Steinhage, also testified. He recounted what A.W. told him about her encounter with Frost:

> She spoke to us and said that she had gone up to a residence on Sunset Circle of another location within the exterior boundary of the reservation with a friend of hers named [K.A.]. They had gone up to spend the night at [K.A.'s] grandmother's house, at that residence, and they had been there along with [K.A.'s] uncle, Adam Frost. She basically said that — and throughout her questioning, determined that she had been up there, and at one point or another, she had been left alone with Adam, and he had sexually assaulted her.
> . . .
> She indicated that she told him to stop and tried to push him away, as well as tried to close her legs, essentially, and she was trying to kick him off but was unable to get her legs in a position to be able to do so.

*Id.* at 358–59.

### c. Lynne Murison's Testimony

Lynne Murison is the nurse practitioner who conducted A.W.'s examination at the hospital. Murison testified that she began A.W.'s exam around 4:00 AM and ended it at 9:20 AM. As was her typical practice, Murison first conducted a patient history about the incident and then conducted a physical examination. One of the purposes of a patient history is to determine the appropriate course of treatment. *See id.* at 281 ("[D]epending on the history, I will give medications."); *id.* at 306 ("There are some medications we don't give if alcohol is on board.").

Murison testified that A.W. told her, as part of the history,

-10-

[T]hat she and a friend had gone over to the casino. They wanted to drink, so they found someone to buy drinks for them. That they walked back to her friend's house, got some scratches along the way, and then they were in Adam's room. And apparently, this young woman's grandmother came in and saw the friend, told her to leave. The friend left, but in the process, they were hiding [A.W.], and she was sort of hidden on the bed.

She said she was very drunk. And this man that she called Adam began to approach her and asked her questions like whether she had ever had sex before. She told him no. Began to touch her breasts, as I recall, and she told him to stop and tried to push him away.

*Id.* at 283. After refreshing her recollection, Murison continued:

[A.W. said] "he was taking my pants off, and I tried to stop him, but I couldn't."

"Then he said, 'I want to taste you down there.' She said, 'I was making loud noises.'"

Then he entered her, which I often will ask, did he put his penis inside your vagina. She clarified that as yes. She said, "That really hurt and I got louder."

Then he withdrew the penis from the vagina, put his fingers inside. When he finished that, he retried, reentered the vagina. She said, "I got really loud."

He entered her rectum, went past the anus, which inside is called the rectum, and she said, "That really hurt and I got even louder." And then he passed out.

*Id.* at 284. When the government asked her to clarify the extent to which A.W. resisted Frost, Murison said that "she was trying to push him away as well as telling him no, and when he was inside her or trying to get inside the rectum, that she also was trying to push him off and was unable to." *Id.* at 284–85.

-11-

As Murison began the physical exam, "[A.W.] just broke down in tears and said, 'I can't do this by myself. I need my sister.'" *Id.* at 292. At that point Murison brought Bridget into the examination room. Murison testified that A.W. was "very tearful" during the exam, and that they took two or three breaks to allow A.W. to regain her composure. *Id.* Murison then described the results of the physical examination, which revealed several small injuries to A.W.'s vaginal and anal area.

On redirect examination, the government asked Murison, "When you're taking the patient's history, is it fair to say that you're doing that primarily for the purposes of medical diagnosis and treatment?" *Id.* at 305. Murison answered, "Yes." *Id.* at 306. When asked whether any law enforcement purpose of the exam was secondary, Murison responded, "Our role at that time is not as law enforcement. We're there to get a history, gather evidence, come to a conclusion." *Id.* She testified that knowing the patient's history helps her to decide what medications to prescribe.

### d. Agent Wallace's Testimony

At about 6:00 AM, while still in the hospital, A.W. was interviewed by FBI Agent John Wallace. Most of Wallace's questions covered the same ground previously covered by Medina, Steinhage, and Murison. Wallace's questioning was detailed and specific, not open-ended; A.W. was "pretty literal" and Wallace "had to ask each question." R., Vol. 3, at 432. Most of the account A.W. gave

Wallace matched very closely with the accounts she gave Medina, Steinhage, and Murison.

One question Wallace asked was how long A.W. had known K.A. A.W. told him she had known K.A. "for about a year." *Id.* at 425. This statement contradicted A.W.'s testimony on direct examination that she had known K.A. only for a few days, and on cross that she had known her for a few weeks.

Another question was, "How did you get back in the house?" *Id.* at 430. A.W. "Basically said, 'We snuck in through the window.'" *Id.* Wallace "assumed" this meant A.W., K.A., and Frost all entered through the window, contrary to A.W.'s testimony that Frost had entered through the front door and opened the window for A.W. and K.A.

On cross-examination, Frost's counsel questioned Wallace about portions of his testimony that supposedly differed from his official report. In particular, she identified a discrepancy regarding the moment when Harris removed K.A. from Frost's room. Wallace had testified that Frost and K.A. had covered A.W. with a blanket when Harris came in, and that K.A. told A.W. she would be "alright." *Id.* at 435. Wallace's report, however, made it seem as if it was Harris, not K.A. that told A.W. she would be alright; the report stated, "Ms. Harris came into the room, took [K.A.] out, and told [A.W. she] would be okay." *Id.* at 473. Wallace stood by his testimony and explained the discrepancy as inartful note-taking.

## 5. *Defense Counsel's Closing Argument*

In her closing argument, defense counsel highlighted several inconsistencies between A.W.'s testimony and other witnesses' testimony. Counsel pointed out that A.W. had given conflicting accounts regarding how long she had known K.A.: "there is a big difference between knowing somebody for a couple of days, which . . . is what she first said on direct, to knowing somebody a couple of weeks, which is what she said on cross, and knowing somebody for a year, which is what she said to Agent Wallace." *Id.* at 563. Counsel argued this discrepancy "goes to her credibility. Nobody confuses that amount of time if you know somebody for a year versus a few weeks versus a few days." *Id.*

Similarly, counsel identified inconsistencies regarding precisely what happened when Harris removed K.A. from Frost's room:

> [A.W.] testified that Ms. Harris came into the room, took [K.A.] out, and they covered her up with blankets, and she stayed there. In another scenario, she told Agent Wallace Ms. Harris came into the room, took [K.A.] out, looked at her, and said, "You'll be all right in here." In some statements, she said, "I was intoxicated, I was drunk, I had to lay on the bed. When I had to go to the bathroom, [K.A.] had to help me." When I asked her what she meant by help, did she have to hold you up, "No, I was able to walk on my own." She told Ms. Murison . . . that they hid her under a blanket because she was too drunk to get up. When I asked [A.W.] from the stand did she say that to Ms. Murison, she said no, and if Ms. Murison said that, it would be incorrect.

> These inconsistencies have a bearing on, then, your evaluation of did she say no to Adam Frost, did she say don't, did she say stop, did she try to push him away.

*Id.* at 564.  Based on these and other alleged inconsistencies, counsel urged: "[A.W.] gave her testimony, gave several different statements at different times, and some of those statements just fly in the face of common sense and reason." *Id.* at 566.

Ultimately, the defense arguments were unsuccessful, and the jury convicted Frost.

## B. Discussion

Frost claims the district court plainly erred in allowing five witnesses to testify about what they were told by A.W. despite defense counsel's failure to object to the testimony.  Frost contends the testimony of Bridget W., Medina, Murison, Steinhage, and Wallace regarding what A.W. told them in the hours following the alleged rape was hearsay, and therefore inadmissible under Federal Rule of Evidence 802.

We conclude the district court did not plainly err in admitting any of this testimony.  First, the admission of Bridget W.'s testimony was not error because of the excited utterance exception to the hearsay rule.  *See* Fed. R. Evid. 803(2).  Second, even if in error, the admission of the testimony of Officers Medina and Steinhage under the excited utterance exception was not plain error.  Third, the admission of most of Murison's testimony was not error due to the medical history exception to the hearsay rule, and her remaining testimony, though arguably inadmissable, did not affect Frost's substantial rights.  Fourth, even if

-15-

the admission of Agent Wallace's testimony was error, the error did not affect the fairness of the proceedings because Frost invited the testimony and based his defense strategy around inconsistencies between Wallace's testimony and A.W.'s testimony.

### 1. *Standard of Review: Plain Error*

Because Frost did not object to the admission of the challenged testimony at trial, we review the district court's decision only for plain error. *United States v. Hinson*, 585 F.3d 1328, 1333 (10th Cir. 2009) (citing *United States v. Olano*, 507 U.S. 725, 731 (1993); *United States v. Schene*, 543 F.3d 627, 640 (10th Cir. 2008)). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1222 (10th Cir. 2008)). An error is "plain" if it is "clear or obvious at the time of the appeal." *United States v. Cordery*, 656 F.3d 1103, 1106 (10th Cir. 2011) (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005)). "To satisfy the third prong of the plain error test, however, [Defendant] must demonstrate that the error affected his substantial rights, i.e., that the error disturbed 'the outcome of the district court proceedings.'" *United States v. Taylor*, 413 F.3d 1146, 1154 (10th Cir. 2005) (quoting *United States v. Cotton* 535 U.S. 625, 632 (2002)). And to satisfy the fourth prong, the error must "implicate core notions of justice," or "fundamental

-16-

fairness issues." *United States v. Sierra-Castillo*, 405 F.3d 932, 941–42 (10th Cir. 2005).

We note that the plain-error standard, while difficult to overcome, serves an important goal: to balance "our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *United States v. Young*, 470 U.S. 1, 15 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)). As one of our circuits recently observed:

> The purpose of plain error review is to instill in litigators the importance of preparing adequately before appearing in the trial court and, as necessary, clarifying issues to that court. Timely, adequate objections allow the trial court to rule in the first instance and, if necessary, correct itself without spawning an appeal. This standard usually shields the district court from reversal because of error that was unwittingly committed, because not brought to its attention. The standard also shields this court from ruling on issues that have been insufficiently vetted below. Plain error review implicitly acknowledges that, in many cases, an appeal represents the triumph of hindsight, as a party attempts to shore up objections ineffectively lodged in the trial court, or not lodged at all, by adducing after-the-fact support for its position.

*United States v. Chavez-Hernandez,* 671 F.3d 494, 497 (5th Cir. 2012). If not for the plain-error standard, parties might be tempted to deliberately avoid a timely objection in order to challenge an unnoticed error on appeal. Accordingly, we will find plain error only when "an error is 'particularly egregious' and the failure to remand for correction would produce a 'miscarriage of justice.'" *United States v. Trujillo-Terrazas*, 405 F.3d 814, 820 (10th Cir. 2005).

-17-

We should also note that the failure to lodge routine evidentiary objections at trial presents particular challenges for appellate review. A timely objection permits the parties to bolster a necessary foundation or explain why none is necessary. And as most trial lawyers know, not every objectionable question is objected to. Trial strategy, witness sympathy, and other factors play into the decision to challenge particular lines of questioning. Parties may deliberately invite otherwise objectionable testimony to gain some advantage at trial; "[f]or example, a defendant may seek to present to the jury a confession by an alleged fellow culprit. There may be components of the confession that could be damaging to the defendant, but the defendant believes that the overall impact would be quite favorable." *Id.* Thus, to some extent the failure to object can be a strategic choice, and not fodder for reversal on plain error review. *See, e.g.*, *United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000); *United States v. Baker*, 432 F.3d 1189, 1215 (11th Cir. 2005); *United States v. Davis*, 443 F.2d 560, 564–65 (5th Cir. 1971) ("In the case before us there was no objection to the testimony of the witness [] on direct examination. On cross-examination counsel for the appellant elicited further information and stressed that which the Government had introduced. By so doing we are precluded from invoking the plain error rule and reversing because of the production of this evidence.").

With this background, we examine the testimony of each of the challenged witnesses.

## 2. *Bridget W.'s Testimony*

A.W. made a number of statements to her sister, Bridget W., after the incident, hearsay statements that Bridget W. recounted at trial. The Federal Rules of Evidence allow the admission of hearsay testimony if the declarant's statement is the result of a startling or stressful event:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . .
>
> (2) Excited Utterance. A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.

Fed. R. Evid. 803(2).

Rule 803's advisory notes explain the rationale for this exception and offer some guidance regarding how we should apply it:

> The theory of Exception [paragraph] (2) is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. Spontaneity is the key factor
>
> . . .
>
> With respect to the time element . . . the standard of measurement is the duration of the state of excitement. How long can excitement prevail? Obviously there are no pat answers and the character of the transaction or event will largely determine the significance of the time factor.
>
> . . .

Permissible subject matter of the statement is [not] limited . . . to description or explanation of the event or condition . . . the statement need only relate to the startling event or condition, thus affording a broader scope of subject matter coverage.

Fed. R. Evid. 803 Advisory Comm. Notes (citations and quotation marks excluded).

Recently, in *United States v. Smith*, 606 F.3d 1270 (10th Cir. 2010), we summarized our approach to Rule 803(2):

The so-called excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event. [T]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance. Admissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself. There is no hard time limit that must be met under Rule 803; what is relevant is whether the declarant is still under the excitement of the startling event.

*Id.* at 1279 (citations and quotation marks omitted).

A.W.'s statements to Bridget W. satisfy all three requirements of the excited utterance exception. First, A.W. called Bridget W. directly after experiencing two startling events: being raped, and being kicked out by Harris in the middle of the night. Second, the facts indicate A.W. was under the stress of the events when she called Bridget; she was crying, and was still crying and visibly upset when Bridget arrived to pick her up several minutes later. Third, the

statement related directly to the startling event: A.W. told Bridget she had been raped by Frost.[1]

Thus, Bridget W.'s hearsay testimony was covered by the excited utterance exception and therefore was admissible.

### 3. Officer Medina's and Officer Steinhage's Testimony

The government argues the testimony of Officers Medina and Steinhage was also admissible under the excited utterance exception. A.W.'s hearsay statements to the officers clearly satisfy the first and third requirements of the exception: the statements were made after startling events and related to those events. It is less than clear, however, whether these statements satisfy the requirement that "the statement[s] w[ere] made while the declarant was under the stress of the event's excitement." *Smith*, 606 F.3d at 1279. A.W.'s statements were a product of police questioning approximately an hour after the encounter, and the exception does not encompass every statement made in response to police interrogation while the declarant is upset. At the same time, there is no categorical rule that statements made to police are per se inadmissible under the excited utterance exception.

In determining whether statements to police are admissible as excited utterances, courts have looked to two primary factors. First, they have looked to

---

[1] While the uncontested facts support application of the exception, a timely objection to admissibility could have required the government to elicit additional foundation if the defense truly believed the exception did not apply.

the spontaneity of the statement. A spontaneous statement volunteered by the declarant is more likely to come within the exception than a statement that is elicited by detailed police questioning. *Compare, e.g.*, *United States v. Arnold*, 486 F.3d 177, 186 (6th Cir. 2007) (admitting victim's exclamation to police that the defendant had threatened her with a gun), *with Paxton v. Ward* 199 F.3d 1197, 1211 (10th Cir. 1999) (finding statement inadmissible because, among other reasons, it "was not spontaneously volunteered, but rather was offered in response to questioning").

But even if prompted by questioning, a statement may be admissible if the questions are somewhat open-ended. *See, e.g.*, *United States v. Phelps*, 168 F.3d 1048, 1055 (8th Cir. 1999) (district court did not abuse its discretion by admitting statements to officer where "[e]ach time [victim] began to talk to [officer] about the shooting, she began to cry, despite [officer's] attempts to calm her down," and victim's "statements to [officer] were not made in response to suggestive questioning"); *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir. 1980) (no abuse of discretion where officer "did not ask [victim] suggestive questions but . . . only asked [victim], 'what happened?'" and victim "did not give a detailed narrative but spoke in short bursts about the incident").

Second, courts have looked to the level of excitement experienced by the declarant. If the declarant's excitement level is severe, then even statements made in response to questioning may be admitted. *See, e.g.*, *United States v.*

-22-

*Belfast*, 611 F.3d 783, 817–18 (11th Cir. 2010) (statement made four to five hours after victim tortured and threatened with death admissible); *United States v. Clemmons*, 461 F.3d 1057, 1061 (8th Cir. 2006) ("Although Officer . . . testified that [declarant] was talking . . . in a calm manner, [declarant] had suffered five gunshot wounds and lay bleeding on the ground. . . . [I]t would be unreasonable to conclude that someone recently suffering multiple gun-shot wounds . . . is likely to calculate who he might unfairly blame for his injuries.") (quotation marks omitted); *Webb v. Lane*, 922 F.2d 390, 394 (7th Cir. 1991) ("[T]he fact that the statements were made in response to . . . questions, although relevant, did not destroy their . . . spontaneity. The tremendous shock and stress caused by the shooting and [the declarant's] subsequent pain may well have postponed his opportunity to reflect."). Not only life-threatening violence, but also sexual assault, are encounters that may produce the requisite level of emotional excitement in some victims. *See, e.g.*, *Iron Shell*, 633 F.2d at 86 (applying exception where evidence "suggested . . . that [nine-year-old declarant] had struggled with the defendant, that he had threatened her with serious harm and that he had unsnapped and pulled down her jeans. The stress and fear that such an occurrence would impose upon a young girl cannot be discounted."); *see also United States v. Bercier*, 506 F.3d 625, 630 (applying exception where eighteen-year-old declarant was "shaking and crying uncontrollably [and] had trouble breathing" about "fifteen to twenty minutes" after sexual assault).

Conversely, statements made after a clear opportunity for reflection, even if entirely voluntary, may be inadmissible. *See, e.g.*, *Winzer v. Hall*, 494 F.3d 1192, 1200 (9th Cir. 2007) ("If [declarant] was able to calmly and coolly call 911 several hours after the threat and discuss both the threat and other circumstances, she must have weighed the costs of intrusion against the benefit of obtaining help from the police.").

Reviewing the facts here places this case somewhere in the middle. Although A.W. was no longer in danger, she had just been through an ordeal that anyone would find traumatic—let alone a seventeen-year-old girl with no prior sexual experience. The officers questioned A.W. within a short time after the alleged rape, and the evidence suggested A.W. had been in a heightened emotional state since she left Frost's residence. Like the declarant in *Phelps*, A.W. had difficulty communicating her account of the events due to her agitation. *See* R., Vol. 3, at 258 ("She was very upset. I allowed her to regain her composure, and it did take a while to finally get it out of her. She was crying. She was very emotional.").

There are other facts, however, that cut against finding A.W.'s statements were spontaneous. Most significantly, the officers' testimony shows that they questioned A.W. in a detailed fashion. Officer Medina methodically had A.W. walk through each step of the night's events, and asked specific clarifying questions when A.W. was unclear. *See, e.g.*, *id.* ("I asked her if she knew what

-24-

that meant, to be penetrated, and she shook her head yes. And I asked if [Frost] penetrated her vagina, . . . and she said yes . . . ."). This type of questioning differs from the open-ended questioning found in the cases described above. A general question like "what happened?" may serve as a nudge that elicits an excited utterance, whereas responses to detailed questioning lack the characteristic spontaneity of an excited utterance.

Had Frost objected to the officers' testimony at trial, a strong case against admissibility could have been made. But Frost must show the error was plain— that it was "clear or obvious at the time of the appeal." *Cordery*, 656 F.3d at 1106. This he cannot do. A.W.'s statements to the officers came when she was still visibly upset. Under only slightly different facts, the court's admission of the officers' testimony may have been entirely unproblematic. Thus, we cannot say that the officers' testimony was obviously inadmissible, such that the district court should have excluded the testimony even without an objection from Frost.

Therefore, we find the court did not commit plain error in admitting the testimony of Officers Medina and Steinhage.

### 4. Nurse Murison's Testimony

Frost next contends it was plain error to admit Nurse Murison's hearsay statements regarding what A.W. told her about the incident. But some hearsay statements are admissible under the federal rules if they are related to the declarant seeking medical treatment:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

. . .

(4) Statement Made for Medical Diagnosis or Treatment. A statement that:

(A) is made for — and is reasonably pertinent to — medical diagnosis or treatment; and

(B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

Fed. R. Evid. 803. This exception "is founded on a theory of reliability that emanates from the patient's own selfish motive—her understanding 'that the effectiveness of the treatment received will depend upon the accuracy of the information provided to the physician.'" *United States v. Joe*, 8 F.3d 1488, 1493–94 (10th Cir. 1993) (quoting 2 McCormick on Evidence § 277, at 246–47 (John W. Strong ed., 4th ed. 1992)).

Most of A.W.'s statements to Murison fall within this exception. A.W. needed to describe what had happened so that Murison could make an informed judgment about how best to proceed with the examination and whether to prescribe medications. Details regarding whether, where, and how A.W. was touched are pertinent to medical diagnosis in a sexual assault case. *United States v. Tome*, 61 F.3d 1446 (10th Cir. 1995); *see also United States v. Nathan J.*, 127 F.3d 1110, *1 (10th Cir. 1997) (unpublished) (allowing, under plain-error

-26-

standard, medical examiner's hearsay testimony about the details of the victim's assault).

Certain aspects of Murison's testimony may have been inadmissible, including A.W.'s identification of Frost and her claims of loud resistance. Ordinarily, a hearsay statement identifying an accused rapist is not covered by the medical diagnosis or treatment exception. *Tome*, 61 F.3d at 1450.[2] Here, however, Frost admitted he had sex with A.W. but argued she consented. Thus, hearsay statements identifying Frost, even if admitted in error, were harmless.

A.W.'s claims of loud resistance are potentially more problematic, but our review is hampered by the incompleteness of the factual record. Hearsay determinations are particularly fact- and case- specific. *See United States v. Pursley*, 577 F.3d 1204, 1220 (10th Cir. 2009). Had Frost timely objected to Murison's testimony, we would have a record to determine whether those statements were made for the purpose of diagnosis or treatment and were relevant to that endeavor. Since no objection was made, these issues were not explored in detail below; all we have is Murison's general affirmation that the patient history was "primarily for the purposes of medical diagnosis and treatment," and not law

---

[2] There are some circumstances in which the identity of the accused abuser is pertinent to medical diagnosis or treatment, and therefore admissible—for example, when the assailant is a member of the victim's family or household. *See Tome*, 61 F.3d at 1450.

-27-

enforcement.  R., Vol. 3, at 305–06.  We are thus left to speculate regarding the pertinence of A.W.'s claims of resistance.

We suspect that a victim's description of how loud she resisted often will not be pertinent to medical diagnosis or treatment.  But such a description sometimes may be pertinent—for example, when used to describe the level of pain experienced by the victim.  Questions about a patient's pain level are legitimate medical inquiries, and the patient's responses to such questions might be admissible under the medical exception.  *See United States v. Santos*, 589 F.3d 759, 763 (5th Cir. 2009).  And, of course, a patient's description of the location of pain may guide an examiner in looking for injuries.

Here, while A.W.'s descriptions of loud resistance may have been pertinent to the location and intensity of her pain, they could also emphasize her lack of consent.  Without more factual development, it is impossible to know whether the medical hearsay exception should apply.

Given these circumstances, and mindful that Frost bears the burden of showing plain error, we decline to reverse based on Murison's hearsay testimony. The medical pertinence of hearsay statements is a heavily fact-dependent matter. *See, e.g.*, *United States v. Pacheco*, 154 F.3d 1236, 1242 (10th Cir. 1998).  Where the determinative facts are missing from the record due to the defendant's failure to make a timely objection, we will not find plain error based on the possibility that better factual development would have made the error clear.  *See United*

-28-

*States v. Easter*, 981 F.2d 1549, 1556 (10th Cir. 1992) ("Plain error review is not appropriate when the alleged error involves the resolution of factual disputes."). Otherwise, "we could reverse and remand because of 'plain error' even though it may ultimately be resolved that there was no error at all." *United States v. Lewis*, 594 F.3d 1270, 1288 (10th Cir. 2010). Some hearsay errors are blatant enough to warrant plain-error reversal even without much factual development, but such is not the case here.

### 5. Agent Wallace's Testimony

Finally, Frost argues the admission of Agent Wallace's testimony was plain error. We find, however, that the admission of Agent Wallace's testimony neither prejudiced Frost, nor seriously affected the fairness, integrity, or public reputation of the proceedings. Thus, Frost cannot overcome the third and fourth prongs of plain-error review.

To satisfy the prejudice prong of plain error, "a defendant 'must demonstrate a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *United States v. Caraway*, 534 F.3d 1290, 1299 (10th Cir. 2008) (quoting *United States v. Fields*, 516 F.3d 923, 944 (10th Cir. 2008) (internal quotation marks omitted)). Here, there is no such probability. Wallace's testimony "was hardly central to the trial." *Id.* at 1300. Before Wallace testified, A.W.'s account had already been corroborated by four other witnesses, including two other law enforcement officers. It is unlikely that

Wallace's cumulative testimony would have changed the jury's evaluation of A.W.'s credibility.

Insofar as Wallace's testimony might have had some impact, it likely would have benefitted Frost rather than the government. There were several inconsistencies between A.W.'s testimony and the account she gave to Wallace. Frost's counsel confronted A.W. with these inconsistencies on cross-examination, and then returned to highlight them during her cross-examination of Wallace. Indeed, Wallace appears to be the *only* hearsay witness whose account included significant discrepancies from A.W.'s testimony.

In light of the cumulative nature of Wallace's testimony and its dubious value to the government's case, we find there is not a reasonable probability that, but for Wallace's testimony, the jury would not have convicted Frost. Thus, Frost fails to establish the prejudice prong of plain error.

With regard to the fourth prong, we also find that Wallace's hearsay testimony did not "seriously affect the fairness, integrity, or public reputation of the proceedings." *Hinson*, 585 F.3d at 1333 (10th Cir. 2009). It was Frost's counsel, not the government, who first made Wallace known to the jury, on her cross-examination of A.W.:

> Q. And while you were there [at Mercy Hospital], did you give a statement to another . . . agent named John Wallace?
>
> A. Yes

-30-

. . .

Q. . . . When you talked with Agent Wallace, you told him that you and [K.A.] had been friends for about a year, didn't you?

A. Yes.

Q. And yesterday, you testified you all had been friends, first you said a few days, and then you said a few weeks. Is that correct?

A. Yes. But I couldn't remember how long I've known her.

Q. So had you known her for a year or had you known her for a few weeks?

A. About a year.

. . .

Q. Did you tell Agent Wallace that after the three of you left Thriftway and went back to Adam's house that all three of you snuck through the bedroom window?

A. No.

Q. And if he said that, that would be incorrect?

A. Yes.

Q. Did you tell Agent Wallace that when Ms. Harris came into the room and saw [K.A.], that she removed [K.A.] from the room by her hand, took her by the hand and took her out of the room?

A. Yes.

Q. Did you also say to Agent Wallace that Ms. Harris looked at you and told you you would be okay in the bedroom?

A. No.

Q. And if he says that you said that, that would be incorrect?

A.  Yes.

R., Vol. 3, at 212.

The clear intent of this exchange was to point out the inconsistencies between A.W.'s testimony and the account she gave to Wallace.  Frost's counsel later highlighted these inconsistencies in her cross-examination of Wallace.  Finally, counsel made A.W.'s credibility the centerpiece of her closing argument, and again highlighted the inconsistencies between her testimony and Wallace's account.  Given the importance of these inconsistencies to the defense counsel's argument, her failure to object to Wallace's testimony reflects more a deliberate strategic choice rather than an oversight.  Frost received the benefit of these highlighted inconsistencies, even though his strategy was ultimately unsuccessful.

Under these circumstances, we do not believe that Wallace's testimony seriously undermined the fairness, integrity, or public reputation of Frost's trial.

## II.  Allocution Challenge

Frost also claims that the district court violated his allocution rights by sentencing him before he had a chance to address the court.

### A.  Background

After conviction and before sentencing, probation services prepared a presentence report and recommended sentence. According to the presentence report, although Frost fell within the most lenient criminal history category under the Sentencing Guidelines, that category significantly under-represented his

criminal history because it failed to account for his past convictions in tribal court. The presentence report therefore recommended the court apply a higher criminal history category, yielding a guidelines range of 188 to 235 months' imprisonment, and further recommended the court impose a mid-range sentence of 200 months.

Frost objected in writing to the recommendation prior to sentencing. Nonetheless, at the beginning of the sentencing proceedings, the court told Frost and his counsel: "I think there is justification for a much higher sentence, but I will abide by the recommendation of Probation and impose a sentence of 200 months." R., Vol. 3, at 603.

The court then asked Frost, "[A]t this time is there anything you'd like to say before I state a sentence?" *Id.* at 604. Frost answered yes, and read a prepared statement to the court, which covers about three pages of the transcript. His counsel then spoke again, asking the court for a sentence of 188 months. The government responded, asking the court to adopt the presentence report's recommendation.

The district court concluded this segment of the proceeding with an offer to the parties: "This is a proposed sentence, and you may comment on it." *Id.* at 612. The court then explained in detail that it had considered the appropriate factors and concluded that 200 months was an appropriate sentence. The court engaged in a formal pronouncement of the sentence, including all the sentencing

conditions, and then again asked the parties for comment. Defense counsel's only request was that a condition on Frost's computer and internet usage be lifted, to which the court agreed. Finally, the court "ordered that the sentence as I stated it will be the sentence imposed." *Id.* at 620.

## B. Discussion

Because Frost did "not object to the purported violation of his allocution rights at the . . . hearing," we "review for plain error." *United States v. Rausch*, 638 F.3d 1296, 1299 (10th Cir. 2011). As a general matter, allocution errors are not subject to harmless-error analysis, because it is difficult for defendants to establish that proper allocution would have resulted in a lower sentence. *Rausch*, 638 F.3d at 1300–01. But even so, allocution errors are not automatically subject to reversal. They still must meet the fourth requirement of plain error—that they "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1301. Like many trial errors, "denial of the right of allocution is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Mendoza-Lopez*, 669 F.3d 1148, 1153 (10th Cir. 2012) (internal quotation marks omitted).

Rule 32 requires that "before imposing [a] sentence, the court must . . . address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P.

32(i)(4)(A)(ii).  This rule codifies the common law right of allocution at sentencing.  *Green v. United States*, 365 U.S. 301, 304 (1961).

If a court "definitively" announces a defendant's sentence before giving him a chance to speak, the court commits reversible error because it "effectively communicate[s] to [the defendant] that his sentence ha[s] already been determined, and that he would not have a meaningful opportunity to influence that sentence through his statements to the court."  *United States v. Landeros-Lopez*, 615 F.3d 1260, 1268 (10th Cir. 2010).  Such error is generally not cured by "the court's later remark that it merely 'intended' to impose" the sentence it announced.  *Id.*; *but see Mendoza-Lopez*, 669 F.3d at 1152 (finding no plain error where court announced its intention to sentence defendant within the guidelines range prior to allocution).

We find the court below did not commit plain error at sentencing.  While the court's preliminary statement obviously disclosed its favorable view of the recommendations contained in the presentence report, the totality of the hearing shows any error by the court did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings," *Rausch*, 638 F.3d at 1301.

First of all, the sentencing transcript shows that the court's statements did not, in fact, inhibit Frost from making a meaningful statement in an attempt to influence his sentence.  To the contrary, Frost spoke at length about his upbringing and family circumstances, as well as his perception of unfair treatment

-35-

at trial and in his past proceedings relating to his prior rape conviction. Frost also proposed "a lesser sentence with the option of probation and early release. And . . . I will succeed in counseling of the probation requirements if I'm allowed to be put on probation as soon and as early as possible." R., Vol. 3, at 606.

Based on these statements and the court's requests for additional comments, we are satisfied Frost had an opportunity to influence the sentence imposed. Indeed, Frost was undeterred by the court's preliminary statement and he and his counsel took full advantage of the opportunity to attempt to influence the court's decision. Where the court personally invites the defendant to present information to mitigate his sentence, and the defendant in fact does so, fairness is not seriously affected, notwithstanding the presumption of prejudice. *See Mendoza-Lopez*, 669 F.3d at 1153. In addition, Frost "fail[s] to set forth what [else] he would have said to the district court" but for the alleged error. *Rausch*, 638 F.3d at 1302.

These facts differ significantly from the facts in *United States v. Landeros-Lopez*, 615 F.3d 1260 (10th Cir. 2010), in which we remanded for resentencing based on the district court's allocution error. There, after the court announced the intended sentence, the defendant addressed the court "briefly" and apologized for his actions, but did not make an extended argument for leniency. *Id.* at 1265. Here, in contrast, despite the court's alleged error, Frost made an extended statement that included an explicit request for a lower sentence. Put differently,

-36-

even if the court's statements in theory could have "effectively communicated . . . that his sentence had already been determined," *id.* at 1268, Frost's conduct shows that the court's statements did not in fact communicate that to him. *See Mendoza-Lopez*, 669 F.3d at 1153 (finding no serious unfairness where the court did not "conclusively adjudge" the defendant's sentence before allocution).

The present case also differs from *Landeros-Lopez* in another significant way. In *Landeros-Lopez*, the defendant was invited to speak only after the court pronounced the sentence in a lengthy and detailed fashion, with all the trappings of a formal sentence, including the defendant's conditions of confinement and supervised release. *See* 615 F.3d at 1266; *see also United States v. Luepke*, 495 F.3d 443, 445 (7th Cir. 2007). We found that allowing the defendant to speak only after this formal pronouncement would create the impression that the sentence was a "foregone conclusion," thereby undermining the court's legitimacy and damaging "the public perception of fairness." *Landeros-Lopez*, 615 F.3d at 1267.

Here, in contrast, the court did not engage in a lengthy, formal recitation of the defendant's sentence until after the defendant had made an extended plea for leniency. *See Mendoza-Lopez*, 669 F.3d at 1152 (distinguishing *Landeros-Lopez* based on the formality of the court's pronouncement). In addition, both defense counsel and government counsel spoke after Frost, before the court formally announced a sentence, and offered substantive argument regarding the appropriate

-37-

sentence.  Thus, in light of the proceedings as a whole, a public observer would not be left with the impression that Frost did not have a meaningful opportunity to address the court before it finalized his sentence.  *Cf. United States v. Griffin*, 530 F.3d 433, 438 (6th Cir. 2008) (no denial of allocution rights where record reflected that court gave defendant's statements "genuine[]" consideration).  And, as noted previously, Frost gives no indication of what else he would say if given another chance to speak.  *See Rausch*, 638 F.3d at 1302.

Therefore, even if the court's preliminary adoption of the presentence report's recommendation might have been in error, that error did not seriously impair the fairness, integrity, or public reputation of the proceeding.

## III.  Conclusion

For the reasons stated above, we AFFIRM the judgment of the district court.