FILED
United States Court of Appeals
Tenth Circuit

July 20, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

DAVID BRIAN MAGNAN,

　　Defendant - Appellant.

No. 16-7043

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 6:13-CR-00069-RAW-1)**

William P. Widell, Jr., Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender, and Chance Cammack, Assistant Federal Public Defender, with him on the brief), Eastern District of Oklahoma, Muskogee, Oklahoma, for Defendant-Appellant.

Richard A. Friedman, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (Leslie R. Caldwell and Sung-Hee Suh, Deputy Assistant Attorney Generals, United States Department of Justice, Washington, D.C., and Mark F. Green, United States Attorney, and Linda Epperley, Assistant United States Attorney, Eastern District of Oklahoma, Muskogee, Oklahoma, with him on the brief), for Plaintiff-Appellee.

Before **BRISCOE**, **McKAY**, and **BALDOCK**, Circuit Judges.

**BALDOCK**, Circuit Judge.

The district court sentenced Defendant David Magnan, a Native American, to life imprisonment times three after a jury convicted him of murdering Lucilla McGirt and two others in Indian Country in violation of 18 U.S.C. § 1153. Defendant shot McGirt twice and left her to die, paralyzed from the chest down, as part of an execution-style slaying during which he shot four individuals. McGirt died, but not before she identified Defendant as her assailant. On three separate occasions ranging from approximately two to five hours after the shooting, first a police officer, then an emergency medic, and finally McGirt's sister, heard McGirt identify Defendant as the man who shot her. At trial, these three individuals testified to McGirt's respective statements over Defendant's hearsay objections. Defendant now appeals his judgment of conviction. He asserts the district court abused its discretion in ruling McGirt's statements constituted excited utterances admissible under Rule 803(2) of the Federal Rules of Evidence. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm.[1]

I.

In the early morning hours of March 2, 2004, after a day of drinking, Defendant Magnan, Aaron Wolf, and Aaron's uncle, Redmond Wolf, Jr., drove to the home of Jim Howard in rural Indian Country near Seminole, Oklahoma. Aaron's .40

---

[1] Because we conclude the district court did not abuse its discretion in admitting McGirt's statements as excited utterances under Rule 803(2), we have no occasion to address whether such statements were also admissible, as the district court held, under other exceptions to the rule against hearsay.

2

caliber semi-automatic handgun, loaded with hollow point bullets, was in the front center console of Defendant's vehicle. Defendant, a friend of Aaron and former house guest of Howard now persona non grata, was driving. Shortly after midnight, Aaron had phoned Howard's residence and, though he later denied it, threatened to kill Howard over an ongoing family dispute regarding Howard's ownership of the home. Howard had been married to Aaron's aunt, Margie Wolf, and inherited the property when she died. Apparently this did not sit well with some members of the Wolf family, including Aaron.[2]

Howard, Eric Coley, Lucilla McGirt, Karen Wolf, and Karen's daughter, Amy Harrison, were inside the residence as Defendant's vehicle approached. Karen was Margie and Redmond's sister and Aaron's aunt. Coley and McGirt, both friends of Howard, were unrelated to the Wolfs. Howard and his guests had been celebrating Coley's birthday and drinking, at least since early evening. Coley and Harrison heard the vehicle and went outside to meet it. Harrison greeted Redmond, her uncle, and Aaron, her cousin. Meanwhile, Coley informed Defendant that he and his friends were not welcome and should leave. The two men engaged in a scuffle. Coley wrestled Defendant to the ground. Defendant pulled a gun and shot Coley in the abdomen. Coley testified: "As [Defendant] was getting up, I seen him pull

---

[2] Perhaps defense counsel accurately portrayed the Wolf family when during closing arguments he described them as "insular," "clannish," "mean," "violent," and "drunken." Rec. vol. II, at 689. The record, by any reading, does not discount such portrayal.

3

something out of his side and he shot me." Rec. vol. II, at 126.

Coley "remember[s] looking down and seeing smoke coming out of my shirt." *Id.* Coley started to run. Despite a bad leg, Defendant briefly gave chase. Coley ran into the nearby woods to hide, but not before banging on the windows of the house to warn the others. Seconds later, Coley heard "around seven booms" or "shots" come from inside the house. *Id.* at 130. Harrison initially ran into the woods but then, in a panic, returned and sought cover around the house. Harrison heard "about four" shots come from inside. *Id.* at 182–83. Aaron could not recall how many shots he heard but remarked: "I know there was a lot." *Id.* at 412.

After greeting Harrison, Redmond was returning to Defendant's vehicle when he heard a shot: "I seen David kind of leaning over . . . and I heard Eric Coley grunting." *Id.* at 250. As Coley fled, Redmond witnessed Defendant enter Howard's residence. Redmond heard what "[s]ounded like five" gunshots. *Id.* at 252–53. Redmond then entered the house: "As I entered the house, I seen David Magnan walking back and forth, he had a gun in his hand, and I looked on to my right side and I seen my brother-in-law on the [sofa] bed there. . . . As I approached . . . his bed, I just heard a gurgling sound that was coming out." *Id.* at 253.

Aaron was outside with Redmond when they heard the gunshots. At no point did Redmond see Aaron inside the house. Aaron stated he was preparing to go inside and could see Howard on the sofa bed through the screen door when Defendant and Redmond exited the residence. The three men promptly fled in Defendant's vehicle.

4

As they sped off, Defendant threw gun magazines out of the vehicle. Three or four miles later, Defendant turned onto a dirt road and stopped. He wiped the gun with a towel, wrapped the gun in the towel, and instructed Aaron to hide the gun under a pile of bricks off the side of the road. Aaron did so. A while later, Defendant asked Aaron to call the police and report the gun stolen. Aaron refused. Redmond led authorities to the gun the next day. Forensics subsequently established that Aaron's gun was, in all likelihood, the sole murder weapon.[3]

After the three men fled, Coley met up with Harrison near the house. Coley told Harrison he had been shot and was going in the house to have a look. Coley first approached Howard and determined he was dead. He then went to check on Karen Wolf and Lucilla McGirt in the bedroom. Karen was unresponsive and Lucilla was "sitting against the wall, she was needing some water." *Id.* at 133. After briefly speaking to Lucilla, Coley tried to close the bedroom door but by this time Harrison too had come inside to look. Harrison first shook Howard to see if he was awake. "And I felt this jelly blood on my hand." *Id.* at 184. After rinsing her hands, Harrison went to check on her mother. "My mom was facing westward on the floor. Lucilla was laying towards her, looking towards her. I rolled my mom over. I said, 'Mom, Mom, are you awake?' I rolled her over and seen blood coming out of her

---

[3] At trial, Aaron Wolf acknowledged he had been convicted as an accessory after the fact for hiding the gun. He was sentenced to five years in prison and five years of supervision. He did not identify the jurisdiction that prosecuted him.

eyes, nose, and mouth." *Id.* At this point, Harrison, in hysterics, ran to the kitchen where she found Coley. Coley told Harrison to call for help just before he collapsed on the kitchen floor. In a state of panic, Harrison called 911.

Officer Jack Thompson of the Seminole Police Department received a 911 dispatch around 2:44 a.m. informing him that four individuals had been shot at Howard's residence in a rural location. Thompson and two other officers arrived on scene about 3:19 a.m. or shortly thereafter. Meanwhile, medic Anke Bernhardt received an emergency call around 3:00 a.m. She arrived on the scene with other medics about the same time as law enforcement. The medics waited outside about twenty minutes while the officers secured the crime scene and made sure the medics could safely enter the residence.

Thompson first encountered Coley in the kitchen: "There was a large male subject laying on the floor and he was yelling and moaning that he had been shot in the gut." *Id.* at 292. Coley told Thompson "he thought he was going to bleed out." *Id.* Thompson next turned to Howard: "[I]t was very obvious he had been shot it looked like twice. There was a lot of blood and I could tell he was dead . . . ." *Id.* at 293–94. In the front bedroom, Thompson saw two female subjects lying on a floor mattress. Thompson described the entire scene as "tense," "[k]ind of like something out of a movie." *Id.* at 294–95.

> The first lady I could tell was definitely dead . . . . Then the second one, Ms. McGirt, was laying to her side and I wasn't for sure with her so I leaned over . . . the deceased lady . . . and I was shining my light

6

on her, . . . . And at that time she kind of moaned and moved just a little and, . . . just reactions . . . I kind of drew my fist back, you know, out of fear, . . . . I had just seen all these people had been shot . . . but then I realized she's the victim. At this time I tell the medics that this one's alive and then I kind of back off.

*Id.* at 295.

Thompson was in the bedroom when the medics began rendering aid to McGirt. Due to poor lighting, Thompson assisted the medics by shining his flashlight on their subject. McGirt was bleeding. Medics discovered a bullet wound in the back of her right shoulder. Bernhardt observed that McGirt "appeared very anxious. She was having trouble breathing. She looked very nervous and scared, visibly." Rec. vol. I, at 572. "Her vital signs were unstable and her skin was very pale." *Id.* at 573. "Her voice was shaky." *Id.* She had difficulty communicating "because she was short of breath." *Id.* McGirt indicated she was in pain. "She was unable to move any of her extremities or her body parts from the nipple line down." *Id.* McGirt smelled of alcohol but did not appear intoxicated. Medics placed an occlusive dressing on McGirt's shoulder wound and then applied a C-collar and backboard to stabilize her. They provided her with oxygen and initiated two large IVs, standard protocol for a trauma patient, keeping one IV wide open to stabilize her blood pressure.

While Bernhardt administered first aid, another medic identified only as Amy sought to calm and orient McGirt by speaking with her in the bedroom. At trial, Officer Thompson, over Defendant's hearsay objection, testified to their

7

conversation:

> Q. And you said that [the medics] were trying to engage in conversation with her as they were treating her . . . ?
> A. Yes.
> Q. Okay. And did you hear what she was asked and what her response was to the questions the EMTs were asking her?
> A. Yes.
> Q. And can you please explain what you heard?
>
> * * *
>
> A. The medic had asked her who had shot her.
> Q. What did she say?
> A. She had said Dave Magnan or Magna. . . . I didn't know if it was 'Magna' or 'Magnan' but it was something like that.
> Q. Were you able to understand that well enough to know it was Dave Magna or Magnan?
> A. Yes.
> Q. Based on hearing that information, did you . . . communicate this name to someone else . . . ?
> A. I actually typed a report out on it and advised in that report that that's what she had said.

Rec. vol. II, at 298–99.

Around 3:45 a.m., medics moved McGirt from the house into a waiting ambulance for transport to Seminole. Because McGirt's condition remained unstable, Bernhardt had decided to medevac her (as well as Coley) to the Oklahoma University Medical Center in Oklahoma City. McGirt's blood pressure remained low, her pulse elevated, her strength weak, and her skin pale, the latter "an indicator of shock." *Id.* at 319. Bernhardt engaged McGirt in conversation inside the ambulance. At trial, Bernhardt explained that "[i]t is standard protocol for us to check someone's mental capacity, ask them if they know who they are, where they are, and what happened to them." *Id.* at 320. When asked what McGirt told her

8

about what happened, Bernhardt replied, again over Defendant's hearsay objection:

> When I asked her what had happened, she stated that David "Montana" Magnan had come to the residence yelling for someone named Amy. She said that he then entered the residence, came into the room, shot the woman next to her. She said that she had leaned over the bed to try and help her and that's when she was also shot.

*Id.* at 321. McGirt never suggested anyone other than herself, Karen Wolf, and Defendant was in the bedroom when the shooting occurred.

McGirt's sister, Carolyn West, lived in Seminole. West first learned from a "relative" that her sister had been shot. West drove to Oklahoma City and arrived at the hospital before daybreak, just a few hours after the shooting: "I don't know what time it was but it was still dark." *Id.* at 610. West located McGirt in the trauma section of the hospital's emergency room. West noticed blood on her sister's pillow. "By her expression and the way her voice was," West could tell her sister was "scared, . . . she was like anxious . . . ." *Id.* at 610–11. West described McGirt's voice as "shaky and trembly." *Id.* at 611. Over Defendant's third hearsay objection, West testified that without prompting her sister "started telling me what had happened." *Id.* at 610; *see also* Rec. vol. I, at 622-23.

> A.     She said that she was in there laying down and Karen came in there and laid down too. She said she heard David and Aaron, . . . she heard them yelling, calling Karen's name out and Amy's name out. She said she heard some shots and he came in there and shot Karen and shot her.
> Q.     Ma'am, did she say who it was that she saw shoot her?
> A.     She said "Montana" is what she called him.

Q. And have you come to learn that "Montana" is David Magnan?

A. Yes.

Q. Did she seem at all confused about who it was that she saw shoot her that day?

A. No.

\* \* \*

Q. Did she say during that same conversation who shot Karen Wolf?

A. She said the same person that shot her.

\* \* \*

Q. And that would have been the one that she said was "Montana"; correct?

A. Yeah.

\* \* \*

Q. Did she say whether she heard his voice, "Montana's" voice, before she was shot?

A. Yes.

Rec. vol. II, at 612–13.

Nearly three weeks later, McGirt died of respiratory failure as a result of her gunshot wounds. The autopsy report indicated McGirt had been shot twice, once in the right shoulder area and once behind the right ear. The bullet that entered McGirt's shoulder lodged in her spinal cord and caused her paralysis. The report further revealed that Jim Howard and Karen Wolf had died on the scene, both as a result of multiple gunshot wounds. Coley testified that the gunshot he sustained outside the house "hit my kidney, . . . punctured my lung, messed up my diaphragm, cut my intestine in half, took out my spleen, and . . . broke a rib." *Id.* at 137. Coley recovered only after enduring several surgeries to repair his wounds.

\* \* \*

10

Defendant was originally charged and convicted pursuant to a plea of guilty in Oklahoma state court because prosecutors mistakenly believed Howard's residence where the murders occurred was located outside Indian Country. On federal habeas review, we vacated Defendant's convictions for want of state court subject matter jurisdiction. *Magnan v. Trammell*, 719 F.3d 1159 (10th Cir. 2013). Defendant was subsequently indicted in federal court. Prior to trial, Defendant filed motions in limine to exclude from evidence McGirt's statements identifying him as the gunman.[4] The Government in turn moved, pursuant to numerous exceptions to the rule against hearsay, for an evidentiary hearing to lay the foundations for the admission of McGirt's statements. Officer Thompson, Medic Bernhardt, and Carolyn West testified at the hearing. These witnesses' hearing testimony was substantially similar to the testimony they rendered at trial. Following the hearing, the district court ruled the three statements at issue were admissible into evidence as excited utterances. At trial, the court overruled Defendant's renewed hearsay objections. A jury found Defendant guilty on three counts of murder in Indian Country and the court sentenced Defendant to three consecutive life terms in prison. This appeal followed.[5]

---

[4] Defendant also moved to exclude the admissions of guilt he made during his state court plea colloquy. The district court granted the motion and we affirmed on interlocutory appeal. *United States v. Magnan*, 622 F. App'x 719 (10th Cir. 2015).

[5] Defendant has never suggested that McGirt's statements were testimonial. Therefore, the question of the admissibility of McGirt's statements does not implicate the Sixth Amendment's Confrontation Clause. *See Michigan v. Bryant*, 562 U.S. 344 (2011).

11

II.

Hearsay—an out-of-court statement offered to prove the truth of the matter asserted—generally is thought unreliable and therefore inadmissible at trial. Rule 803(2) of the Federal Rules of Evidence, however, excepts "excited utterances" from the rule against hearsay, regardless of whether the declarant is available for cross-examination. The exception defines an excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The exception proceeds on the theory "that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and produces utterances free of conscious fabrication." *Id.* R. 803 advisory committee's note. Whether the excited utterance exception to the rule against hearsay applies under the particular circumstances of a case is an inquiry committed to the sound discretion of the district court. *United States v. Smith*, 606 F.3d 1270, 1279 (10th Cir. 2010). Because the inquiry is fact-intensive, a district court's decision to admit such testimony "necessitates heightened deference." *Id.* (quotation marks omitted).

The presence of three conditions are necessary before a statement may qualify as an excited utterance. To qualify, the proponent must establish (1) a startling event, (2) the declarant made the statement under the stress of the event's excitement, and (3) a nexus exists between the content of the statement and the event. *Id.* In this case, Defendant acknowledges the Government has met the first

12

and third conditions for admissibility under Rule 803(2). Lucilla McGirt's statements identifying Defendant as the gunman directly related to the fact that she had been shot twice and left to die, paralyzed from the chest down. And a nexus undoubtedly existed between the content of McGirt's statements, *i.e.*, Defendant was the gunman, and the startling event, *i.e.*, she was shot. Defendant limits his challenge on appeal to whether McGirt was still under the stress of excitement when she made her statements identifying Defendant as her assailant. Whether the second condition for an excited utterance is met requires a court to consider a range of factors. These include (a) "the amount of time between the event and the statement," (b) "the nature of the event," (c) "the subject matter of the statement," (d) "the age and condition of the declarant," (e) "the presence or absence of self-interest," and (f) "whether the statement was volunteered or in response to questioning." *United States v. Pursley*, 577 F.3d 1204, 1220 (10th Cir. 2009).

Defendant first objects to Officer Thompson's testimony that he heard McGirt identify Defendant as the gunman while medics sought to stabilize her condition inside the bedroom of Howard's residence. Defendant points out that McGirt made her initial statement about an hour and a half to two hours after the shooting in response to a medic's direct question about the shooter's identity. But "[t]here is no precise amount of time between the event and the statement beyond which that statement cannot qualify as an excited utterance. *Admissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not*

13

*the event itself.*" *Smith*, 606 F.3d at 1279 (emphasis added) (brackets, citations, and quotation marks omitted); *see also Pursley*, 577 F.3d at 1204 (citing cases upholding application of the exception where two to four hours passed prior to the declarant's statement). Similarly, no categorical rule exists that a statement made in response to a question falls outside the exception for excited utterances. *United States v. Frost*, 684 F.3d 963, 974 (10th Cir. 2012), *overruled in part on other grounds by United States v. Bustamonte-Conchas*, 850 F.3d 1130 (10th Cir. 2017) (en banc). All other things being equal, a declarant's spontaneous statement surely is more likely to qualify as an excited utterance than a statement in response to questioning. *See id.* ("A spontaneous statement volunteered by the declarant is more likely to come within the exception than a statement that is elicited by detailed police questioning."). In the end, however, the query we must answer in determining whether a statement satisfies Rule 803(2)'s second condition is whether the statement was the product of reflective thought or the stress of excitement caused by the startling event. *Pursley*, 577 F.3d at 1220. Notably, "[i]f the declarant's excitement level is severe, then even statements made in response to questioning may be admitted." *Frost*, 684 F.3d at 974.

In this case, the district court did not abuse its discretion in holding that McGirt's first statement naming Defendant as her assailant was an excited utterance within the meaning of Rule 803(2). Rather, the court acted well within its discretion in concluding McGirt made this statement while suffering, apart from her physical

wounds, from the overwhelming stress of the shooting's excitement. This is so notwithstanding the fact that McGirt made her statement between ninety minutes and two hours after the shooting in response to a medic's direct question concerning the shooter's identity. The partly-paralyzed, bleeding victim of multiple gunshot wounds, McGirt had witnessed both her own shooting and the shooting of Karen Wolf at something close to point-blank range. That McGirt first heard the shots that took the life of Howard and preceded Defendant's entry into the bedroom is virtually certain. When Officer Thompson encountered McGirt just a short time prior to her statement, he witnessed her moaning and moving slightly—hardly an indication that McGirt had been engaged in or was even able to engage in reflective or deliberative thought. In naming Defendant as the gunman, McGirt most likely wanted to ensure her safety. Medic Bernhardt observed that while in the bedroom, McGirt "appeared very anxious," "was having trouble breathing," and "looked very nervous and scared, visibly." Rec. vol. I, at 572. "Her vital signs were unstable and her skin was very pale." *Id.* at 573. McGirt's situation was, in a word, dire. We agree with the Eighth Circuit that "[i]t would be unreasonable to conclude that someone recently suffering multiple gunshot wounds and awaiting the arrival of paramedics is so nonchalant about h[er] condition that [s]he is likely to calculate who [s]he might unfairly blame for h[er] injuries." *United States v. Clemmons*, 461 F.3d 1057, 1061 (8th Cir. 2006) (observing that while the declarant was talking calmly on his cell phone, he had suffered five gunshot wounds and lay bleeding on the ground).

15

Defendant effectively acknowledges that McGirt's first statement likely was not attributable to reflective thought or conscious fabrication. Defendant tells us "it is illogical to conclude that a statement made by an intoxicated woman who has likely been in and out of consciousness and suffering brain trauma could be anywhere near the realm of accurate or trustworthy." Appellant's Br. at 20. Maybe so.[6] But while the record establishes McGirt had been drinking, Bernhardt testified she did not appear "drunk." Rec. vol. I, at 578. Moreover, despite the extent and severity of her traumatic injuries, nothing in the record indicates McGirt was "in and out of consciousness," or suffered brain damage. In ascertaining the primary purpose of a victim's statements in response to interrogation, *i.e.*, in undertaking a Confrontation Clause analysis, the Supreme Court has recognized, much like Defendant does here, that "a severely injured victim may have no purpose at all in answering questions posed; the answers may be simply reflexive," and perhaps inaccurate. *Michigan v. Bryant*, 562 U.S. 344, 369 (2011); *see also supra* n.5 But the Supreme Court has also suggested, albeit in the same context, that where conscious fabrication is unlikely due to the stress of excitement, the nature and

---

[6] We are well aware that both courts and commentators have criticized the excited utterance exception to the rule against hearsay "on the ground that excitement impairs accuracy of observation as well as eliminating conscious fabrication." Fed. R. Evid. 803(2) advisory committee's note. *See*, *e.g.*, *United States v. Boyce*, 742 F.3d 792, 796 (7th Cir. 2014); 2 *McCormick on Evidence* § 272, at 366 (7th ed. 2013). But because Defendant does not ask us to hold the well established exception invalid on its face, we consider his argument that the district court abused its discretion in applying the exception only on the facts presented.

severity of a declarant's wounds do not bear upon a statement's admissibility, but rather "weigh on the credibility and reliability" a jury could afford her statement. *Id.* at 369 n.12.

Much the same analysis applies to Defendant's hearsay objection to McGirt's second statement. Medic Bernhardt testified that once inside the ambulance, McGirt again identified Defendant as her assailant. But this time, McGirt's statement was in response to the more general query "what happened." Rec. vol. II, at 321. Perhaps unlike a specific question under less than "dire" circumstances, "a general question seeking the reaction of the speaker for what he had just experienced does not by itself go far to displace the reactive force of a stimulus that has a great impact on the speaker." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8.68, at 591 (4th ed. 2013); *see also Frost*, 684 F.3d at 974 ("[E]ven if prompted by questioning, a statement may be admissible if the questions are somewhat open-ended."). Moreover, given the traumatic event McGirt had experienced just two or so hours prior, she surely remained "within the temporal range of trauma contemplated by Rule 803(2)." *Pursley*, 577 F.3d at 1221. At this point, McGirt's vital signs remained unstable and she appeared to be approaching a state of shock. She was strapped to a backboard, wearing a C-collar, and receiving fluids from two IVs designed to sustain her blood pressure. Undoubtedly, McGirt "was still languishing under the event's agitation" when she made her second statement. *Id.* One could reasonably conclude that McGirt's situation remained dire. Because of

17

the wide variety of factual scenarios presented, "appellate courts have recognized substantial discretion in trial courts to determine whether a declarant was still under the influence of an exciting event at the time of an offered statement." 2 *McCormick on Evidence* § 272, at 372 (7th ed. 2013). Nothing in the record here warrants disturbing the district court's conclusion that McGirt made her second statement identifying Defendant as the shooter while still under the stress of the horrific events she had experienced just prior.

This brings us to the question of whether McGirt's third statement may qualify as an excited utterance. When McGirt made her third statement incriminating Defendant, this time to her sister Carolyn West in the hospital's emergency room, as much as four to five hours had passed since the shootings. Defendant went on his rampage, shooting McGirt and the others, sometime around 2:00 a.m. West testified she arrived at the hospital in Oklahoma City to visit McGirt before sunrise. On March 2, 2004, the day of the shootings, the sun rose in Oklahoma City at 6:57 a.m. (available at https://www.timeanddate.com/sun/oklahoma-city?month=3&year=2004 (last visited June 22, 2017)). According to Defendant, by this point McGirt had time to reflect and was no longer experiencing the stress of the shooting's excitement. No one disputes that the time element increasingly weighs in favor of Defendant's argument that McGirt's statements fall outside Rule 802(3)'s exception for excited utterances. But "[h]ow long can excitement prevail? Obviously there are no pat answers and the character of the . . . . event will largely determine the significance

18

of the time factor." Fed. R. Evid. 803 advisory committee's notes. Time is but one factor in our equation. *McCormick on Evidence* tells us:

> A useful rule of thumb is that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. Testimony that the declarant still appeared "nervous" or "distraught" and there was a reasonable basis for continuing emotional upset will often suffice. The nature of the exciting event and the declarant's concern with it are obviously relevant.

*McCormick on Evidence, supra* at § 272, at 370.

Defendant asserts that once at the hospital, "McGirt has had ample time to come down from the stress and excitement of the initial event and this is shown by her improving condition and her expanding narrative on what actually occurred." Appellant's Br. at 26. At the very least, however, reasonable minds could differ on whether the passage of four to five hours was "ample time to come down from the stress and excitement" of the unexpected execution style slaying and blood bath McGirt had witnessed and been an innocent victim of. Given the horrific nature of the circumstances McGirt personally encountered and her critical medical condition, no one can doubt that she had "a reasonable basis for continuing emotional upset." In the trauma section of the emergency room, West saw blood on her sister's pillow, indicative of the upper body gunshot wounds McGirt had sustained. West described her sister as "scared" and "anxious," and her voice as "shaky and trembly." Rec. vol. II, at 610–11. Paralyzed from the breast down, McGirt could not help but be

19

preoccupied (perhaps an understatement) with her condition.

Importantly, McGirt's third statement identifying Defendant as her then would be assassin was entirely spontaneous. It was prompted not by any inquiry into what had occurred, but by the appearance of her sister, undoubtedly an emotional moment for McGirt. Moreover, McGirt's statement to her sister as to the gunman's identity was consistent with her prior two statements, both of which were sufficiently trustworthy to be admitted into evidence. Even four or five hours after the shootings, nothing of an intervening nature apart from emergency medical assistance had occurred that might have influenced or brought about McGirt's statement to West. *Cf. Paxton v. Ward*, 199 F.3d 1197, 1211 (10th Cir. 1999) (recognizing that "[a]ny number of intervening events could have occurred that would have influenced or indeed brought about the statement at issue"). And given the extent of McGirt's injuries—injuries that were to prove fatal—the rendering of such assistance surely did little to dilute the effect of the recent event's trauma. McGirt's ongoing state of distress as revealed by the record certainly might lead a reasonable person to conclude that her spontaneous statement to West was a result of the stress of excitement of the early morning's event. Accordingly, the district court did not abuse its discretion in holding McGirt's third statement constituted an excited utterance within the meaning of Rule 803(2).

* * *

The judgment of the district court is AFFIRMED.

20

No. 16-7043, United States v. Magnan

**BRISCOE**, Circuit Judge, concurring.

This case involves a lengthy trial transcript in which the testimony was extremely unreliable and contradictory. In this case, we are fortunate that the conflicting testimony is largely irrelevant to the question presented. Rather than venture into that bramble and risk misstatements, I focus only on the circumstances surrounding the three statements that McGirt made to Thompson, Bernhardt, and West and whether those statements were admissible under an exception to the general rule against hearsay.

We review a district court's decision to admit or exclude evidence for an abuse of discretion. United States v. Rutland, 705 F.3d 1238, 1245 (10th Cir. 2013). "Due to the fact-specific nature of a hearsay inquiry, the district court's ruling necessitates 'heightened deference.'" United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009) (quoting United States v. Trujillo, 136 F.3d 1388, 1395 (10th Cir. 1998)).

Applying that standard, I agree that the three hearsay statements made by McGirt identifying Magnan as the person who shot her are admissible as excited utterances. Excited utterances provide an exception to the rule against hearsay and are admissible. Fed. R. Evid. 803. An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed R. Evid. 803(2). Thus, this exception "has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event." Pursley,

577 F.3d at 1220.

### 1. Thompson

Thompson's testimony regarding McGirt's statement is admissible as an excited utterance. Magnan concedes that there had been a startling event and that McGirt's statement related to that event. Aplt. Br. at 17. He challenges only the district court's conclusion that McGirt was still under the excitement of the event when she made the statement.

According to Thompson's testimony, he arrived on the scene approximately thirty minutes after the 911 call reporting the shooting. ROA vol. II, at 289. Coley was laying on the kitchen floor, "yelling and moaning that he had been shot in the gut." Id. at 292. Thompson described the atmosphere inside the house as "tense" and "[k]ind of like something out of a movie" because "it was dark," and "all the lights from the police car and ambulances were going and bouncing off the walls." Id. at 294–95. Thompson found McGirt in a bedroom, lying next to the body of Karen Wolf who was "definitely dead at the time." Id. Thompson testified that there was blood in the bed, that McGirt had been shot in the shoulder, and that he thought she "was probably going to die there on the scene." Id. at 296. McGirt was able to speak but not move. Id. Thompson held his flashlight up to assist the medics as they treated McGirt. Id. at 297.

According to Bernhardt's testimony, regarding the same time frame, McGirt "appeared to be extremely anxious" and Bernhardt "could tell that [McGirt] was in pain by the look on her face." Id. at 309. McGirt "was obviously having trouble breathing and

2

she was bleeding." Id. at 310. "She was able to move her head and her upper extremities but nothing from the middle of her chest down." Id. "Her vital signs were unstable." Id. McGirt's blood pressure was low so Bernhardt started two IVs, which is "standard protocol for any trauma patient." Id. at 316. McGirt was also given an oxygen mask. Id.

Thompson testified that, as the medics worked, McGirt identified Magnan as the person who shot her. Id. at 299. The district court did not abuse its discretion in finding that, under these circumstances, McGirt was still under the stress of having been shot twice when she made this statement.

Magnan argues that McGirt's statement cannot be an excited utterance because it was offered in response to a medic's question,[1] but the spontaneity of the statement is only one factor courts should consider. See Pursley, 577 F.3d at 1220–21. The fact that McGirt was responding to a question does not outweigh the fact that she was still at the scene, gravely injured, and surrounded by emergency responders. The amount of time between the event and the statement, the nature of the event; the subject matter of the statement, the condition of the declarant; and the absence of self-interest all indicate that this was an excited utterance. See id.

Magnan also argues that McGirt's statement cannot be an excited utterance because her "condition was undeniably grave" and "she was likely drunk." Although these factors could impact the reliability of the statement (and were appropriately raised

---

[1] Responses to questions asked by police officers may be subject to more scrutiny, see Frost, 684 F.3d at 974, but the questions here were asked by a medic.

3

on cross-examination), the appropriate weight to afford a witness's testimony is for the jury to decide; these questions of reliability do not undercut the district court's conclusion that McGirt's statement was an excited utterance. See Michigan v. Bryant, 562 U.S. 344, 369 n.12 (2011) (recognizing that juries must determine the reliability of testimony and noting that the excited utterance exception to the rule against hearsay remains widely supported in spite of criticism that "excitement impairs [the] accuracy of observation as well as eliminating conscious fabrication" (quoting Advisory Committee's Notes on Fed. Rule Evid. 803(2))). In fact, McGirt's "grave" condition strengthens the argument that she was still under the stress of being shot.

Finally, Magnan argues that McGirt was shot in the back of the head and that the house was dark, so there is no evidence that she saw the shooter. I cannot find any place in the record where this was argued to the district court, and Magnan makes no attempt to argue that it was plain error. See United States v. Faust, 795 F.3d 1243, 1251 (10th Cir. 2015). Further, the testimony of Bernhardt and West indicates that McGirt heard Magnan when he entered the house and saw him when he shot Karen. ROA vol. II, at 321, 612–14.

## 2. Bernhardt

For the same reasons, Bernhardt's testimony regarding McGirt's statement is also admissible as an excited utterance. Bernhardt testified that McGirt was transported to the hospital by ambulance and then by helicopter. Id. at 317, 322. While in the ambulance, McGirt was unstable, had low blood pressure, had an elevated pulse, was weak, was pale,

4

and was in shock, indicating that her body was shutting down in response to trauma. Id. at 319. Bernhardt testified that she did not expect McGirt to survive. Id. at 322. It was during this ambulance ride that McGirt again identified Magnan as the person who shot her. Id. at 321. Again, the district court did not abuse its discretion in finding that, under these circumstances, McGirt was still under the stress of having been shot twice when she made this statement.

Magnan argues that any stress McGirt was under at the time of this statement was caused by the work of the medics, not by the event of being shot. Aplt. Br. at 23. This argument is specious. The medics were present only because McGirt had been shot twice and was gravely injured. Further, Magnan openly admits that "McGirt's condition ha[d] not dramatically improved." Id.

Magnan also argues that too much time had passed since the startling event, and that McGirt's statement was not spontaneous, but in response to a question. Id. at 23–24. Again, we must consider all the factors together. See Pursley, 577 F.3d at 1220–21. The facts that McGirt responded to a question and that approximately two hours had passed since she was shot, do not outweigh the facts that she was in an ambulance on her way to a helicopter transport to the hospital, her body was shutting down due to trauma, and medics were working continuously to keep her alive. The nature of the event; the subject matter of the statement, the condition of the declarant; and the absence of self-interest all indicate that this was an excited utterance. See id.

### 3. West

The district court also did not abuse its discretion in allowing West's testimony regarding McGirt's statements in the hospital. Magnan again concedes that there had been a startling event and that McGirt's statement related to that event, but argues that too much time had passed since that event and that McGirt had had an opportunity to reflect. Aplt. Br. at 25–26.

If we were to review the admissibility of this testimony de novo, I might reach a different conclusion, but, given the fact-intensive nature of applying hearsay exceptions, the district court's determination was not unreasonable. According to the testimony of West, she arrived at the hospital the morning after the shooting while it was still dark. Id. at 609. When she arrived, McGirt was in the ER trauma center. Id. at 610. West described McGirt as "scared" and "anxious." Id. She testified that McGirt's voice was "shaky and trembly." Id. at 611. McGirt told West "that she was paralyzed from the breast down." Id. While West was with McGirt, she noticed blood on McGirt's pillow. Id. at 612. The doctor then came in, "checked it out," and said "that it was a bullet wound," apparently one previously unnoticed. Id. It was then that McGirt for a third time identified Magnan as the person who shot her. Id. at 612–14.

In particular, the fact that the doctor discovered an additional bullet wound during this conversation indicates that McGirt's condition was so unstable that the doctors had not yet ascertained the full extent of her injuries, and also that McGirt was still learning new information about the severity of her condition. It is hard to say that McGirt was no

6

longer under the stress of the event of being shot when her doctor was still in the process of assessing her very serious injuries. Given the gravity of McGirt's condition and the testimony regarding her emotional state at the time of her statements to West, the district court did not abuse its discretion by concluding that McGirt was still under the stress of being shot just hours before.