**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 23, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ABEL EDUARDO CRISTERNA-
GONZALEZ,

      Defendant - Appellant.

No. 19-7009

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:18-CR-00054-RAW-2)**
_____

John Arceci, Assistant Federal Public Defender, Denver, Colorado (Shira Kieval, Assistant Federal Public Defender, Denver, Colorado on the briefs) for Defendant-Appellant.

Linda A. Epperley, Assistant United States Attorney, Muskogee, Oklahoma (Robert Wallace, Assistant United States Attorney, Muskogee, Oklahoma on the briefs) for Plaintiff-Appellee.
_____

Before **HARTZ**, **EBEL**, and **MATHESON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Abel Cristerna-Gonzalez appeals his conviction by a jury on one count

of possession with intent to distribute methamphetamine and one count of possession

with intent to distribute heroin.  He claims that three evidentiary errors occurred at trial: (1) two law-enforcement witnesses gave expert testimony without being admitted as experts; (2) the government made an impermissible propensity argument in violation of Federal Rule of Evidence 404(b); and (3) the district court allowed irrelevant and prejudicial testimony about the Sinaloa cartel.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.  Defendant did not raise the first two issues at trial, and we hold that there was no plain error.  And although we agree with Defendant that the Sinaloa-cartel evidence was inadmissible, the error was harmless.

## I.      BACKGROUND

On April 24, 2018, Oklahoma State Trooper Cody Hyde stopped a black Dodge Durango for speeding at 81 mph while traveling eastbound on Interstate 40 in Sequoyah County, Oklahoma, which borders Arkansas.  The driver was Luis Lopez Arce.  Defendant, the sole passenger, was sitting in the front seat.  After obtaining license and registration information and asking the occupants about their travel plans, Hyde grew suspicious.  To begin with, the vehicle registration document showed that the Durango had been registered to Arce only two days before the trip, and Arce said he had just bought it.  Hyde testified that in his experience, drug-trafficking organizations commonly register vehicles in the name of the driver shortly before use.  Arce and Defendant also contradicted each other in several respects.  Among other things, Arce referred to Defendant as his cousin, but did not know his last name, whereas Defendant conveyed in Spanish (though Hyde knew little Spanish) that Arce was a friend, not a relative, and that he did not know Arce's name.  Also, Arce said they were going to Arkansas to work in

2

agriculture—a claim Hyde found strange given the time of year and his knowledge of the region's farm production.  Defendant, on the other hand, said they were traveling to Nashville.

Hyde requested permission to search the vehicle, and both men agreed.  He and two fellow officers found four packages of drugs weighing about a pound each in a light bar atop the Durango.  A light bar is an accessory mounted atop a vehicle to provide additional lighting, often for traveling off-road.  It is an "aftermarket" accessory; an owner must separately acquire and attach it because it is not factory-installed.  The light bar on the Durango had been specially enlarged to create more space inside it.  Tools fitting the light bar's parts were found set aside by a toolbox in the rear of the Durango, and the officers were able to open the light bar with those tools.  Laboratory tests showed that three packages contained nearly pure methamphetamine and one contained heroin.

Defendant was not interrogated on the day of his arrest because none of the officers adequately spoke Spanish and no interpreters were readily available.  But he gave an account of the trip at trial.  He testified that he had met Arce for the first time only five days to a week before the arrests.  He said he had worked in Phoenix, Arizona, as a welder for Crossroads Equipment Repair (which apparently included a tire shop) until two weeks before the arrests.  He also had his own business as a welder and metalworker for which he rented workspace behind Crossroads.

According to Defendant, Arce paid him $100 to install the light bar, which Defendant did some two days before the two left on their trip.  The light bar was wired at Crossroads, though Defendant said he did not know who performed that work.  The day

3

that the two departed from Phoenix in the Durango, Arce picked Defendant up from Crossroads.

Defendant testified that he knew nothing of the drugs in the lightbar. Thus, the only issue at trial was Defendant's knowledge. One item of evidence used by the government to prove his knowledge was a text message sent to the cell phone that he was holding during the traffic stop. The text was sent via WhatsApp, an application that provides end-to-end encryption, so that no one other than the sender and recipient can read the message. The phone number of the sender was saved in the cell phone's contact list as belonging to "TN Bro 2." R., Vol. II at 207. The text arrived not long after Defendant had been arrested. (He had been told to leave the phone in the Durango while it was being searched.) The parties stipulated to the following English translation of the Spanish text:

> As soon as you take out the material I'll need you to send me pictures of the China and the Cold before sending it so see what the quality is ok . . . Right now send me at least 10 of 28 points of the cold and 10 of the China from the 25 points each ok friend leave them in pieces and don't grind it . . . Put also 4 separate points individually as samples friend, ok and let me know as soon as the material is ready, friend[.]

Aplt. Supp. App., Ex. 23.

Agent Brian Epps, a special agent with the Drug Enforcement Administration (DEA), testified to his interpretation of the message. He said that the terms "China" and "Cold" were code for heroin and methamphetamine, respectively. He explained that the text directed the recipient to take the drugs out upon arrival and send photos of the drugs. Then the heroin was to be placed into 10 bags of 25 grams (points) each, and the

4

methamphetamine was to be put in 10 bags of 28 grams each. Finally, there should be four bags of 1 gram each as samples.

Three additional texts were sent from "TN Bro 2" about four-and-a-half hours after Defendant and Arce were taken into custody. As translated into English, those texts read:

(1) What's up my man? Everything ok?
(2) Our friend Pepe has been trying to locate you my man he is wanting to do a job with you it's what I hope and that all of you are well, ok
(3) What happened my man, are you all ok?

*Id.*

In its case in chief the government offered additional evidence tying Defendant to the phone. Stored on the phone were numerous videos and audio files of Defendant singing, and about 20 photos depicting Defendant, including "selfies." And in some of the WhatsApp outgoing texts on the phone the user had identified himself by Defendant's first name, Abel, and had referred to the phone as "my phone." (The record does not indicate the timing of the videos, audios, or texts.)

In any event, when Defendant took the stand in his own defense, he admitted that the cell phone that received the texts was his. He testified that the day he met Arce at the tire shop, Arce said that he was trying to sell the phone. Defendant agreed to buy it, although he did not have the money to pay for it at the time. The phone service was in the name of José Catana, a person that Defendant testified he did not know.

Nevertheless, Defendant testified that the incriminatory texts were not intended for him and that Arce had used the phone at times during the trip. Defendant did not explain

5

why Arce could not have used one of the two cell phones in the vehicle's console. Both phones were new. On one, Arce was the subscriber. All that was stored on the other phone was evidence of three calls to the phone Defendant had in his hands at the time of the stop. Neither phone contained any messages related to a drug delivery. (There was a fourth cell phone in a duffel bag in the back of the Durango; Defendant acknowledged it as his own, but it could not take calls or receive messages because the service contract had expired.)

On Defendant's phone there were no drug-related text messages preceding the arrests. But Defendant was alone in the Durango while Hyde questioned Arce in the police vehicle. And when Hyde returned to the Durango, Defendant was constantly looking at his phone while Hyde asked him questions. In closing argument the prosecutor suggested that Defendant could have erased any previously sent or received incriminating texts while alone during the stop.

Also to show Defendant's knowledge of the purpose of the trip to Nashville, the government offered into evidence bank-account records obtained during the investigation. In the Durango was a copy of an application for a bank account opened on April 18, 2018, about a week before the stop. It was signed by Defendant and gave his address as 3450 W. Missouri Avenue in Phoenix and his employer as C Rock and Supply, although he testified that he had not lived at that address for a number of months and he had worked for that employer only when he first arrived in the United States about two years earlier. The bank records, which were subpoenaed by the government,

6

revealed two accounts, although the government focused on certain transactions on the earlier-created account.

The bank records themselves are not part of the record on appeal, but we get some idea of their content from the trial testimony. Several large cash deposits (including deposits of $8000 on January 30, 2018; $5000 on February 12; and $6000 on February 23) were made in Nashville into Defendant's first account, with the full amount being withdrawn by Defendant (his signature is on the receipt) in Phoenix on the same day for the first two deposits and over a period of time for the third. Altogether, $29,600 in cash was deposited in Nashville into Defendant's account between January and April 2018, and a total of $23,000 in cash amounts exceeding $500 was withdrawn from the account by Defendant in Phoenix during the same time period. Agent Epps testified that such transactions were common among drug traffickers who would in that way funnel the proceeds of a drug sale in a distant city and withdraw the profits back home without running the risk of having the cash seized by law enforcement on the trip back. (Two other money transactions are of less interest. In the Durango were two receipts for money transfers from Defendant to destinations in Mexico—$2300 to Culiacan, Sinaloa and $965 to Tijuana.)

Defendant testified that there was nothing improper about the cash transactions. He said a man named Ahlen who owned Crossroads (his employer) had asked to use Defendant's bank account to transfer money while traveling. Being a nice fellow, Defendant accommodated him. When the funds arrived in Defendant's account, Defendant withdrew the funds in cash and delivered them. Defendant said that on at least

7

one occasion he gave the funds to Ahlen's wife, because Ahlen was traveling, and his wife needed the money to "pay for the insurance of the car place." R., Vol. II at 272–73. A few days before his arrest, Defendant had opened his other account at the bank. He testified that he did that because he was having difficulty making payments on the original account and he wanted others to stop using that account.

Defendant also testified to an innocent purpose of the trip. He said it was his idea to go to Tennessee. He explained that he suffered from high blood pressure and nose bleeds so he wanted to move somewhere that was cooler than Phoenix—hence, Nashville. He wanted a job there but had nothing lined up and knew no one in Nashville. And the only clothing in the Durango was in a small duffel bag. Arce claimed the bag as his, but Defendant said that some of the clothes in the bag belonged to him. Defendant also testified that the tool box and the tools lying outside the box were his. He said he brought his tools along because he intended to use them later.

But several items of evidence linked Defendant to the Durango in ways suggesting that he was more than a mere passenger. To begin with, although the vehicle registration was issued to Arce, the address on the title was Defendant's former address of 3450 W. Missouri Avenue in Phoenix. Defense counsel claimed during closing arguments that Arce put Defendant's address on the document seemingly without Defendant's knowledge, but Defendant testified that Arce had asked whether he could do so and Defendant had agreed. Also, photos of the receipts for the Durango's registration and insurance were on Defendant's phone. Both receipts were dated April 22, *after* Defendant said he had acquired the phone. Finally, the Durango contained not only the

8

previously mentioned financial records of Defendant but also several documents with Ahlen's name on them—namely, a sales receipt for the Durango dated in October 2017, several months before Arce acquired title to the vehicle (the appellate record does not indicate whether Ahlen is described as the seller or buyer); a sales receipt for another SUV-type vehicle; and two receipts for transfers of money to Mexico.

## II. DISCUSSION

On appeal, Defendant asserts that three evidentiary errors occurred below: (1) Trooper Hyde and Agent Epps were lay witnesses who provided expert testimony without being qualified as experts; (2) the government made an impermissible propensity argument relying on transactions in Defendant's bank account; and (3) the district court improperly allowed discussion of the Sinaloa cartel despite there being no evidence linking Defendant to the cartel.

### A. Expert Testimony

We agree with Defendant that the testimony by Trooper Hyde and Agent Epps included expert opinion. The distinction between lay and expert opinion is set forth in Federal Rules of Evidence 701 and 702. Rule 701 limits the opinions to which lay witnesses can testify to those "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 702, in turn, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

9

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Reading these rules together we have explained, "Rule 701 does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) (internal quotation marks omitted). In particular, "[k]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *Id.* at 1215 (brackets and internal quotation marks omitted). Although a law-enforcement officer's testimony based on knowledge derived from the investigation of the case at hand is typically regarded as lay testimony, opinion testimony premised on the officer's professional experience as a whole is expert testimony. *Compare United States v. Marquez*, 898 F.3d 1036, 1050 (10th Cir. 2018) (officer's testimony explaining meaning of code words was not "expert testimony improperly masquerading as lay testimony" because "this was not a situation in which [the officer's] knowledge about the meaning of coded drug language was based on past investigations; her testimony was based on what she learned during *this* investigation"), *with United States v. Beirle*, 810 F.3d 1193, 1203 (10th Cir. 2016) (Hartz, J., concurring)

10

(opinion "based on police training and the experience of conducting hundreds of interviews easily fits" the *James River* description of expert testimony).

Defendant points to the opinions offered by Trooper Hyde and Agent Epps regarding (1) the movement of drugs and drug profit along I-40; (2) the use of "pipeline" or "funnel" accounts in drug operations; (3) the meaning of coded terms in text messages sent to Defendant's phone; and (4) common practices of drug-trafficking organizations, including the use of scales (scales were found in the duffel bag) and how cars are typically registered by such organizations.

This was all expert testimony based on prior training and experience rather than what was learned in the investigation of the drugs in the Durango. *See, e.g.*, *United States v. Lovern*, 590 F.3d 1095, 1102 (10th Cir. 2009) ("In cases prosecuting the trafficking of common street drugs . . . , courts have routinely upheld the admission of expert testimony from law enforcement officers seeking to identify for the jury typical indicia of drug trafficking activity."); *United States v. Quintana,* 70 F.3d 1167, 1171 (10th Cir. 1995) (detective's testimony that "term 'ball' meant 'one 8th of an ounce of cocaine, an 8 ball'" and that "150 for every 9 [meant] $150 for every 9 ounces of cocaine . . . clearly fell within the parameters of Rule 702 and precedent in this Circuit").

The government argues that Trooper Hyde did not give expert testimony, but rather overview testimony. It relies on *United States v. Duran*, 941 F.3d 435, 446 (10th Cir. 2019), which stated that "[t]he prosecution can ordinarily present overview testimony describing the start of, and techniques in, the investigation." But this does not

11

get the government very far since overview testimony "can include lay and expert opinion." *United States v. Brooks*, 736 F.3d 921, 930 (10th Cir. 2013).

At trial Defendant did not object to the admission of the testimony he now characterizes as inadmissible expert opinion. We therefore review Defendant's claim only for plain error. *See United States v. Ramirez*, 348 F.3d 1175, 1181 (10th Cir. 2003) (failure to object to testimony as expert opinion). To prevail, Defendant must show "(1) error, (2) that is plain, which (3) affects his substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Adams*, 888 F.3d 1134, 1136 (10th Cir. 2018) (brackets and internal quotation marks omitted). "An error is plain if it is clear or obvious at the time of the appeal." *United States v. Frost*, 684 F.3d 963, 971 (10th Cir. 2012) (internal quotation marks omitted), *overruled on other grounds by United States v. Bustamante-Conchas*, 850 F.3d 1130 (10th Cir. 2017).

To begin with, we question whether there is any error in admitting expert-opinion testimony without a judicial ruling on the witness's qualifications when no objection has been raised to the testimony. A comment to American Bar Association Civil Trial Practice Standard 14 (Aug. 2007) states the Bar's understanding that "[a] judicial ruling that a proffered expert is 'qualified' is unnecessary unless an objection is made to the expert's testimony." (https://www.americanbar.org/groups/litigation/policy/civil_trial_standards/). But even assuming that the trial judge should have ruled on the qualifications of the witnesses before allowing the testimony, it is hardly plain that the evidence was inadmissible.

12

First, there is no problem with the nature of the testimony. Courts have repeatedly admitted similar testimony from qualified law-enforcement witnesses. *See, e.g.*, *Duran*, 941 F.3d at 452 (FBI agent with "over 16 years' experience in law enforcement, including observation of 75 to 100 drug deals and more than 50 controlled buys" could provide expert testimony on meaning of coded language in intercepted calls); *Lovern*, 590 F.3d at 1102 (officer with 15 years of experience testified to common indicators of illicit drug operations); *United States v. Miller*, 84 F.3d 1244, 1254 (10th Cir. 1996) (expert witness for government "testified that scales, packaging materials, including baggies and tape, and ledgers are common tools of the drug trade"), *overruled on other grounds by United States v. Holland*, 116 F.3d 1353 (10th Cir. 1997); *United States v. Harris*, 903 F.2d 770, 775 (10th Cir. 1990) (FBI agent with four years of experience in drug-records subunit gave expert opinion that seized documents "had characteristics consistent with records of drug business"); *cf. United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015) (expert testimony concerning criminal organization's territory and culture would fall within ambit of Rule 702).

Thus, the only question is whether Trooper Hyde and Agent Epps were qualified to give such expert testimony. But it would be hard to determine that a witness was clearly not qualified to give opinion testimony—that is, that admission of the witness's testimony was plainly erroneous—when there was no challenge to the witness's expertise at trial and the party proffering the witness therefore had no notice of the need to establish the witness's credentials. For this reason we have stated that we are disinclined to find plain error "[w]here the determinative facts are missing from the record due to the

13

defendant's failure to make a timely objection." *Frost*, 684 F.3d at 977. In *Frost* the defendant was tried and convicted of rape of a 17-year-old girl. *See id.* at 965. At trial the nurse who examined the victim in the hospital testified to what the victim told her about the incident. *See id.* at 968–69. The defendant did not object at trial but on appeal claimed that this testimony was inadmissible hearsay. *See id.* at 971. We first concluded that most of the victim's statements to the nurse were made for medical diagnosis or treatment, so those statements were admissible under the exception to the hearsay rule in Federal Rule of Evidence 803(4). *See id.* at 976. But our determination of whether the victim's descriptions of her loud resistance fell within the exception was "hampered by the incompleteness of the factual record." *Id.* Although these descriptions "often will not be pertinent to medical diagnosis or treatment," we recognized that they could be relevant "to the location and intensity of her pain." *Id.* at 976–77. We said: "Without more factual development, it is impossible to know whether the medical hearsay exception should apply." *Id.* at 977. And because the defendant bore the burden of showing plain error and his failure to object led to the inadequate factual development, we declined to find "plain error based on the possibility that better factual development would have made the error clear." *Id.* "Otherwise, we could reverse and remand because of plain error even though it may ultimately be resolved that there was no error at all." *Id.* (internal quotation marks omitted). Our conclusion in *Frost* was also influenced by the likelihood that the failure to object was strategic. "[A]s most trial lawyers know, not every objectionable question is objected to. Trial strategy, witness sympathy, and other factors play into the decision to challenge particular lines of questioning." *Id.* at 972.

14

"Thus, to some extent the failure to object can be a strategic choice, and not fodder for reversal on plain error review." *Id.*; *see United States v. Olivas-Castaneda*, 530 F. App'x 791, 792 (10th Cir. 2013) (following *Frost* in circumstances almost identical to those here—failure to object to the expert qualifications of law-enforcement witnesses).

The analysis in *Frost* is particularly apt when considering expert testimony. An advocate has little interest in having the trial judge declare a witness for the opposition to be an "expert," thereby increasing the weight of the witness's testimony in the eyes of the jury.[1] If an objection to the opinion testimony has little chance of being sustained, the

---

[1] For this reason, various authorities advise that both objections to the qualifications of an expert and the court's ruling on such objections should be outside the presence of the jury. The American Bar Association's Civil Trial Standard 14 states: "The court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion, and counsel should not ask the court to do so." ABA Civil Trial Practice Standard 14 (Aug. 2007) https://www.americanbar.org/groups/litigation/policy/civil_trial_standards/. The comment explains:

> If an objection is made to an expert's qualifications, relevancy of expert testimony, reliability or any other aspect of proffered expert testimony, the court need only sustain or overrule the objection. When the court overrules an objection, there is no need for the court to announce to the jury that it has found that a witness is an expert or that expert testimony will be permitted. The use of the term "expert" may appear to a jury to be a kind of judicial imprimatur that favors the witness. There is no more reason for the court to explain why an opinion will be permitted or to use the term "expert" than there is for the court to announce that an out-of-court statement is an excited utterance in response to a hearsay objection.
>
> Because expert testimony is not entitled to greater weight than other testimony, the practice of securing what may appear to be a judicial endorsement is undesirable.

*Id.* The Federal Rules of Evidence Manual expresses a similar view:

15

advocate is much better served by raising no objection and instead using what ammunition is available to impeach the opinion. Accordingly, a party's failure to object to what it perceives to be expert testimony could very well be an intentional decision to avoid having the court declare to the jury that the witness has been recognized as an expert. And because of the possibility of sandbagging (remaining silent on an issue and reserving it for appeal in the event of an adverse judgment), we have good reason to be hesitant to reverse for plain error when the failure to object could have been a "strategic choice." *Frost*, 684 F.3d at 972.

This is not to say there can never be plain error when the appellant raises an unpreserved fact-based argument. Very recently a unanimous Supreme Court rejected the rule in one circuit that "questions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error." *Davis v. United States*, 140 S. Ct. 1060, 1061 (2020) (per curiam) (brackets and internal quotation marks omitted). The Supreme Court said that "[t]he text of [Federal Rule of Criminal Procedure] 52(b) does not immunize factual errors from plain-error review. Our cases likewise do not purport to shield any category of errors from plain-error review." *Id.*

---

Although some judges state before the jury that an expert is "qualified," the better practice is for the trial judge not to indicate to the jury findings regarding a rule of evidence. The judge can overrule any objection to expert testimony and permit an expert to testify without placing the court's imprimatur before the jury as to a witness's expertise.

6 Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, Federal Rules of Evidence Manual § 7-2 (Lexis 2019). The record does not indicate the practice in this regard of the trial judge here.

16

The Supreme Court was not saying, however, that plain error can be established by speculation about the facts. Plain error in this context will be uncommon. Perhaps, for example, a witness's lack of expert qualifications will be clear from the record. The D.C. Circuit's decision in *United States v. Saro*, 24 F.3d 283 (D.C. Cir. 1994), which was cited with apparent approval in *Davis*, is instructive. The court was considering an unpreserved challenge to the truth of the factual finding in the presentence report that the defendant had aided and abetted an uncharged drug sale by participating in the negotiations. The court rejected the proposition that such an unobjected-to error was immune from plain-error review. It explained:

> We see no warrant for this categorical rule. To be sure, since the obviousness of an error is assessed from the sentencing court's perspective, factual errors in pre-sentence reports may well tend to survive plain-error review more readily than legal errors. Pre-sentence investigators often have access to a much broader spectrum of information than the trial court itself, and so the fact that the trial record does not support a particular finding does not necessarily mean that the finding is inaccurate. Sentencing courts generally are entitled to rely on the unchallenged findings of pre-sentence reports. But *at least when those findings are internally contradictory, wildly implausible, or in direct conflict with the evidence that the sentencing court heard at trial, factual errors can indeed be obvious.*

*Id.* at 291 (emphasis added); *see also Frost*, 684 F.3d at 977 ("Some hearsay errors are blatant enough to warrant plain-error reversal even without much factual development, but such is not the case here."). The court reversed and remanded for resentencing because the presentence report contained no evidence that the defendant was involved in the negotiation and such involvement was apparently contrary to trial testimony. *See Saro*, 24 F.3d at 291–92.

17

In our view, Defendant has not come close to satisfying the *Saro* standard. The record shows that both Trooper Hyde and Agent Epps had credentials comparable to those of law-enforcement officers who have been permitted to testify as experts about similar matters in drug-related prosecutions. Trooper Hyde had been with the Oklahoma Highway Patrol for 19 years. At the time of the stop, he was assigned to the special-operations division which enforces traffic laws on interstate highways with a "special interest towards criminal interdiction." R., Vol. II at 126. He had spent 16 years doing that work and had made hundreds of stops resulting in the seizure of methamphetamine and dozens yielding heroin. Agent Epps had 24 years' experience in law enforcement, including four years as a local police officer specializing in narcotics investigations and 15 years as a special agent with the Drug Enforcement Administration. He had participated in and supported numerous drug-related investigations involving the manufacturing, possession, sale, distribution, and importation of a wide range of controlled substances and had completed significant training in narcotics investigations. The experience of the officers in this case is comparable to that of the DEA investigator in *Lovern* who testified to the common indicators of illicit drug operations based on "over fifteen years of experience," 590 F.3d at 1102, and of the FBI agent in *Duran* with "over 16 years' experience in law enforcement, including observation of 75 to 100 drug deals and more than 50 controlled buys," who provided expert testimony on the meaning of coded language in intercepted calls, 941 F.3d at 452. Indeed, we have permitted law-enforcement officers with significantly less experience to testify as experts in drug prosecutions. *See, e.g.*, *United States v. West*, 671 F.3d 1195, 1201 n.6 (10th Cir. 2012)

18

(police officer with two years of experience in dealing with drug cases qualified as expert in drug distribution); *Harris*, 903 F.2d at 775–76 (FBI agent with four years of experience in drug-records subunit qualified as expert in interpreting drug-transaction records).

Notably, Defendant makes no argument on appeal that either officer was unqualified or that any of their opinions were unreliable. Nor did that seem to be a concern of defense counsel during trial. When cross-examining Agent Epps about his interpretation of the text message on Defendant's cell phone, defense counsel seemed to endorse the agent's interpretation:

> **Defense Counsel**: When you were finishing up, Agent Epps, you were talking about some of the language used in that message that was in Spanish, the words frio and – I don't know, there were a few other things in there, but then you described for us cold and China and said they were all terms of art for the drug trade, right?
> **Agent Epps**: Yes.
> **Defense Counsel**: We've all heard those before in many cases.
> **Agent Epps**: Yes.

R., Vol. II at 232. Counsel's challenge to the text message was only that there was no evidence that Defendant himself was familiar with that jargon. And at the close of Agent Epps's recross-examination, defense counsel commented, "You've got a lot of experience, don't you?" R., Vol. II at 238.

We hold that Defendant has failed to establish that admission of the officers' opinion testimony was plain error.

19

## B.     Cash-Transfer Evidence

Defendant next contends that the government's presentation of the bank-document evidence showing cash transfers violated Federal Rule of Evidence 404(b).  He concedes that he did not make this objection at trial, so our review is only for plain error.  We see no plain error.

The bank documents revealed that in the months before Defendant's arrest, large cash deposits totaling $29,600 had been deposited into his account in Nashville, and on two occasions cash withdrawals matching the deposit amounts were made by Defendant in Phoenix on the same day as the deposits.  Agent Epps testified that this pattern was consistent with pipeline or funnel accounts used by drug traffickers.  The prosecutor relied on this evidence during closing arguments, asserting that the bank statements supported the government's theory that Defendant was on his way to Nashville to deliver the drugs and deposit proceeds into his account for withdrawal in Phoenix, consistent with the scheme suggested by the previous cash transfers.

Federal Rule of Evidence 404(b)(1) provides:  "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  The rule has deep historical roots based on concerns that a jury will convict the defendant for being a bad person, rather than because the defendant's guilt of the charged offense has been established beyond a reasonable doubt:

> [It] codifies the common law doctrine forbidding the prosecution from asking the jury to infer from the fact that the defendant has committed a bad act in the past, that he has a bad character and therefore is more likely to

20

have committed the bad act now charged. Although this "propensity evidence" is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.

*United States v. Shomo*, 786 F.2d 981, 986 (10th Cir. 1986) (further internal quotation marks omitted).

But evidence of prior bad acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "This rule is one of inclusion, rather than exclusion, unless the evidence is introduced for the impermissible purpose or is unduly prejudicial." *United States v. Smalls*, 752 F.3d 1227, 1237 (10th Cir. 2014) (internal quotation marks omitted).

As a threshold matter, we question whether the cash-transfer evidence is "character" evidence within the meaning of Rule 404(a). Rather, it is akin to evidence of a modus operandi, a distinctive course of conduct that is probative of a similar course of conduct at a later time, not the sort of general propensity that we think of as character. ! *See generally* Paul F. Rothstein, *Evidence in a Nutshell: State and Federal Rules* 105–14 (6th ed. 2011).

In any case, Rule 404(b) permits the government's use of the cash-transfer evidence against Defendant. As we summarized in *Smalls*:

> We consider a four-part test when determining whether evidence is admissible under Rule 404(b): (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice;

21

> and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

752 F.3d at 1237 (internal quotation marks omitted).

Defendant addresses only the first two parts of the test—whether the evidence was used for a relevant proper purpose. In our view, the bank-records evidence was properly admitted. It supported an inference of a course of conduct, a pattern of repeated behavior from which knowledge could be inferred. Evidence obtained at the time of the arrest established that the Durango was transporting substantial quantities of unlawful drugs to Nashville. Obviously, the drugs would be sold for a large amount of cash. The bank records showed that Defendant had repeatedly received large sums of cash from Nashville in the prior three months. One can infer that those sums were payments for previous drug deliveries to Nashville. And one can infer from Defendant's receipt of those payments that he must have known of the purpose of the trip in the Durango. The chain of reasoning is not that Defendant committed the bad acts of receiving large sums of cash and therefore must be a drug dealer. Rather, the evidence establishing a drug delivery to Nashville explains why Defendant was receiving large sums of cash from Nashville; and Defendant's prior repeated involvement implies his knowledge of the drugs in the Durango for this trip. *See* Fed. R. Evid. 404(b)(2) (permitting admission of prior-acts evidence to prove plan and knowledge); *United States v. Collins*, 764 F.2d 647, 653 (9th Cir. 1985) (admission of defendant's checkbook and bank records showing large cash deposits during time defendant was said to have been importing drugs did not violate Rule 404(b) as evidence "was relevant to her claims that she was ignorant of the

22

eight pounds of cocaine which she received"). The district court did not err in allowing the government's use of the cash-transfer evidence, let alone plainly err.

### C.  Sinaloa-Cartel Testimony

Finally, Defendant argues that the district court erred in admitting testimony that might suggest a connection between this case and the Sinaloa drug cartel. The following exchange occurred as the prosecution elicited evidence that Defendant had transferred $2300 to an address in the state of Sinaloa, Mexico, his place of birth according to his passport:

> **Prosecutor**: Where was the destination for this money?
> **Agent Epps**: Culiacan, Sinaloa, Mexico.
> **Prosecutor**: Is that a location in Mexico that is rather notorious?
> **Agent Epps**: Yes, it is.
> **Prosecutor**: Is there a cartel in Mexico with a similar name?
> **Defense Counsel**: Objection, Your Honor. That is really prejudicial. It calls for speculation.
> **The Court**: Well, I don't know if it calls for – go ahead, Mr. Wallace.
> **Prosecutor**: I intend for everything that this witness testifies to be prejudicial to the defendant and that's why we are here.
> **The Court**: State your objection again, Mr. McGuire. I am sorry. That puts you on the spot.
> **Defense Counsel**: No. It is prejudicial and it is irrelevant. We don't have any information about a cartel in this case. There are a lot of cartels in Mexico and one of them is called Sinaloa.
> **The Court**: Okay, overruled. Thank you.
> **Prosecutor**: As Mr. McGuire has just told us, Agent, isn't there a cartel called the Sinaloa.
> **Agent Epps**: Yes.
> **Prosecutor**: And where is it based?
> **Agent Epps**: Sinaloa, Mexico.
> **Prosecutor**: And do you know where the defendant is from?
> **Agent Epps**: According to the passport and the address used to send this money, Culiacan, Sinaloa.

R., Vol. II at 194–95.

As noted, Defense counsel objected at trial that the testimony was irrelevant and prejudicial.[2]  "We review a district court's evidentiary rulings for abuse of discretion, considering the record as a whole."  *United States v. Martinez*, 923 F.3d 806, 814 (10th Cir. 2019) (internal quotation marks omitted).  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  But even relevant evidence should be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."  Fed. R. Evid. 403.

The only reason we can see for mentioning the Sinaloa cartel is to suggest that Defendant was connected with the cartel.  But the fact that money was sent to Sinaloa is too slim a reed without additional evidence.  *Cf. Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016) ("It is wholly improper to assume that an individual is more likely to be engaged in criminal conduct because of his state of residence, and thus any fact that would inculpate every resident of a state cannot support reasonable suspicion.").  The evidence had very little probative value.  On the other hand, it could suggest to the jury that the trained narcotics agent who was testifying believed that Defendant posed a special danger because he was part of a notorious cartel.  In our view, the district court abused its discretion in failing to rule that the probative value of the evidence was

---

[2]  The government asserts we should review only for plain error because defense counsel did not object to "[a]ny comments or questions beyond the one question."  Aplee. Br. at 26–27.  But we think the objection adequately alerted the court to the problem with the testimony.

substantially outweighed by the danger of unfair prejudice. *Cf. United States v. Pineda-Torres*, 287 F.3d 860, 864–65 (9th Cir. 2002) (where no evidence connected defendant to a drug-trafficking organization and no conspiracy was charged, expert testimony about structure of drug-trafficking organizations to "attribute[] knowledge to the defendant by attempting to connect him to an international drug conspiracy and thus impl[ying] that the defendant participated in a large-scale operation" was impermissible as "this method of imputing knowledge lacks any probative value" (internal quotation marks omitted)); *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996) (recognizing "substantial risk of unfair prejudice attached to gang affiliation evidence," since such evidence "is likely to be damaging to a defendant in the eyes of the jury" because of the negative public view of gangs (internal quotation marks omitted)).

But not every error in a criminal trial requires reversal. Under Federal Rule of Criminal Procedure 52(a), entitled "Harmless Error," "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). Under long-standing authority originating with the Supreme Court, "[a] non-constitutional error is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "[T]he government ordinarily has the burden of proving that a non-constitutional error was harmless." *Id.*

In light of the evidentiary record, we hold that the government carried its burden. We need not recapitulate all the incriminatory evidence set forth in the Background

25

section of this opinion or recite all the adverse inferences that can be drawn from the evidence. Suffice it to say that not only was the evidence of Defendant's connection to the drugs quite strong, but his explanations for the evidence bordered on the preposterous. We mention a few points. There were some damning texts on the cell phone he was holding at the time of the stop. The person who sent the damning text was no stranger to Defendant but was identified in the phone's contact list as "TN [the standard abbreviation for Tennessee] Bro 2." Yet Defendant said that even though the cell phone was his, Arce had used it from time to time despite the ready availability of two other cell phones in the vehicle console (and Arce was the named subscriber for one of them). Defendant testified that on less than a week's notice he had asked Arce, whom he had just met, to help him move from Phoenix to Tennessee for his health and he would be looking for work in Nashville. But he admitted that he had no job lined up, said he did not know anyone there, and had brought along minimal personal items and only a few tools (including tools necessary to open the light bar where the drugs were stored). His bank records showed large transfers of cash from Nashville in recent months. But he denied that the money was for him, testifying that he was only doing a favor for a man named Ahlen, his boss and landlord, who wanted to use Defendant's account to transfer cash. The Durango had purportedly been acquired a few days earlier by Arce, but Defendant's phone had pictures of the registration (which used a recent address of Defendant) and insurance documents for the vehicle, and one document in the vehicle showed that Ahlen had bought or sold the vehicle several months earlier. We think it

26

would be quite hard for a reasonable juror not to convict Defendant on the evidence at trial.

Defendant's best argument against the weight of the evidence is that the jury had difficulty reaching a verdict, doing so only after the district court instructed it on the importance of trying to reach a verdict. But we cannot know what was going on in the jury room. The problem may have been a single irrational holdout. For this reason, our review of harmless error "is an objective one," independent of the specific composition of the jury in the particular case. *United States v. Thompson*, 287 F.3d 1244, 1254 (10th Cir. 2002); *see Neder v. United States*, 527 U.S. 1, 18 (1999) (stating harmlessness test for constitutional error as whether it is "clear beyond a reasonable doubt that a *rational* jury would have found the defendant guilty absent the error" (emphasis added)).

Because we are not left with anything like a grave doubt that the erroneous admission of the Sinaloa-cartel testimony had a "substantial influence" on the outcome of the trial, the error does not require reversal.

### D.    Cumulative Prejudice

Defendant argues that even if none of the alleged errors warrant reversal individually, the cumulative prejudice of all the errors does. We must be careful, however, when we try to integrate harmless-error review and plain-error review, because the analytical frameworks are quite different. The approach this circuit has adopted is to consider the prejudice arising from all the preserved errors (where the government would ordinarily have the burden of showing harmlessness) when determining whether the defendant has satisfied the third prong of plain-error review (where the defendant must

27

show that the unpreserved error has affected the defendant's substantial rights) for unpreserved error:

> First, the preserved errors should be considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required. If, however, they are cumulatively harmless, the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error. In other words, the prejudice from the unpreserved error is examined in light of any preserved error that may have occurred.

*United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008). But in this analysis the unpreserved errors are considered only if those errors were plain. After all, on plain-error review all four prongs must be satisfied; no matter how strong the showing of prejudice to satisfy the third prong, relief is not available unless the other three prongs are also satisfied. And on this appeal we have disposed of the unpreserved arguments on prongs other than the third. We disposed of one unpreserved issue (the cash-transfer issue) on the ground that there was no error, and we disposed of the other on the ground that any error was not plain. Because relief would therefore not be available to Defendant on plain-error review no matter how prejudicial the evidence was to him, the unpreserved issues do not factor into the cumulative-prejudice analysis. *See United States v. Christy*, 916 F.3d 814, 839 (10th Cir. 2019) (including in cumulative-prejudice analysis only unpreserved issues where the error was plain). Thus, the cumulative-prejudice analysis ends with the harmless-error analysis of the Sinaloa issue. We hold that there was no cumulative prejudice.

## III.    CONCLUSION

We **AFFIRM** Defendant's conviction.

28

19-7009, United States v. Cristerna-Gonzalez
**MATHESON**, Circuit Judge, concurring:

I concur in the result and join the opinion except for the discussion of the expert testimony issue. On that issue, I would affirm based on the fourth prong of plain error review by declining to find an error that "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (brackets and quotations omitted).

Mr. Cristerna-Gonzalez argues "it was plain error to permit the government's two non-expert witnesses to testify extensively as to professional opinions regarding patterns and practices associated with drug trafficking." Aplt. Br. at 1. He claims "[t]his testimony [wa]s plainly inadmissible." *Id.* at 17. He contends Trooper Hyde's and Agent Epps's opinions were based on their professional experience and therefore constituted expert testimony. *Id.* at 23-25. He then addresses each step of the plain error analysis.

First, he asserts procedural error for failure to (1) disclose the officers as experts in discovery under Federal Rule of Criminal Procedure 16(a)(1)(G), (2) meet Federal Rule of Evidence 702, and (3) provide a limiting instruction regarding the opinion testimony. *Id.* at 19-20. Second, he cites Tenth Circuit cases to show the error was plain under Rule 702. *Id.* at 21-22 (citing, e.g., *James River Ins. Co. v. Rapid Funding LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011) (holding error to admit expert opinions of a lay witness absent compliance with Rule 702)). Third, he argues that, without the officers' expert testimony, the outcome of the trial probably would have been different. *Id.* at 27-30.

Fourth, he contends the error affected the fairness, integrity, or public reputation of the proceedings. *Id.* at 30-32.

The Government does not contest that it presented the officers as lay witnesses, nor does it rebut that the officers presented opinions based on their experience. But even assuming Mr. Cristerna-Gonzalez plausibly satisfies the first three steps of plain error review, his argument founders at step four. *See United States v. Balderama-Iribe*, 490 F.3d 1199, 1204-06 (10th Cir. 2007) (finding no plain error at step four even if the first three steps were met); *United States v. Trujillo*, --- F.3d ---, 2020 WL 2745526, at *7 (10th Cir. 2020) ("[E]ven if Defendant could satisfy the third prong of plain error review, we would see no need to exercise our discretion to correct the error under the fourth prong.").

At step four of plain error review, we examine "the seriousness of the error . . . in the context of the case as a whole." *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1141 (10th Cir. 2017) (en banc) (quotations omitted); *see Puckett v. United States*, 556 U.S. 129, 142 (2009) ("The fourth prong is meant to be applied on a case-specific and fact-intensive basis."). "[W]e will not notice a non-constitutional error, such as the one in the case before us, unless it is both particularly egregious and our failure to notice the error would result in a miscarriage of justice." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 736 (2005) (en banc) (quotations omitted).

As the Government points out, the record supports, and Mr. Cristerna-Gonzalez does not contest, the officers "could qualify as Rule 702 experts" based on their "vast experience." Aplee. Br. at 13. And as the majority notes, "there is no problem with the

2

nature of the testimony. Courts have repeatedly admitted similar testimony from qualified law-enforcement witnesses." Maj. Op. at 13 (citing cases). Mr. Cristerna-Gonzalez says nothing to suggest otherwise.

Despite the procedural shortcomings he alleges, Mr. Cristerna-Gonzalez was convicted based on the type of opinion testimony that courts routinely admit from officers with the proper qualifications. Under these particular circumstances, *see Bustamante-Conchas*, 850 F.3d at 1141, we should not exercise our discretion to correct the alleged error because admission of the testimony did not undermine the fairness, integrity, or public reputation of the proceedings, *see Olano*, 507 U.S. at 736.